## MERCHANTS' BANK *v.* STATE BANK.

1. Evidence of powers habitually exercised by a cashier of a bank with its knowledge and acquiescence, defines and establishes, as to the public, those powers, provided that they be such as the directors of the bank may, without violation of its charter, confer on such cashier.

2. Where the authority of the agent is left to be inferred by the public from powers usually exercised by the agent, it is enough if the transaction in question involves precisely the same general powers, though applied to a new subject-matter.

Thus, if in the case of a bank having power by its charter to buy and sell exchange, coin and bullion, its cashier have habitually, with the knowledge of the bank, dealt with the public as authorized to buy and sell exchange, then the power to buy and sell coin also (the right to do both being conferred by the same clause of the charter), may be inferred by a jury.

So, if a cashier is shown to have frequently pledged in writing the credit of his bank for large amounts in the usual course of business, with the knowledge of the bank—borrowing and lending its money, and buying and selling exchange—doing all this usually by cashier's checks, though sometimes by certificates of deposit and sometimes by memoranda, the transactions being uniformly made in *faith of the implied powers of* the cashier, without inquiry as to special authorization, and such is shown to be the usage of other banks as above stated, it is evidence from which a jury may infer that such cashier is authorized to pledge the bank's credit by certifying a check to be " good;" this last method being one not distinct in its nature from the others named, but similar

to them, and involving in form and substance the same obligation and consequence to the bank.

3. These principles hold even though it is not shown that any cashier of any bank in the particular place where the transaction which was the subject of the suit arose, ever used his powers to purchase coin, or ever certified a check to be good.

4. The National Currency Act of 1864, authorizing the banks created under it to buy and sell coin, a bank having coin in pledge may sell and assign its special property; in which case the assignee will become vested with the legal rights of the assignor.

5. If a cashier, without authority to buy coin in behalf of his bank, do so buy it, and it goes into the funds of the bank, the bank is liable upon the principle of *quantum valebat.*

6. The clause of the National Currency Act of 1864, which directs that "the usual business" of the banks created under it shall be transacted "*at* an office or banking-house in the place specified in its organization certificate," does not prevent the purchase of coin by one bank at the banking-house of another.

7. The certifying as "good" of checks given in the course of business for convenience, is not within the prohibition of the 23d section of the National Currency Act of 1864, which forbids the issue of post notes or "*other notes*" to circulate as money, other than the ordinary bank bills authorized by the act.

8. A stamp, such as the Internal Revenue Act requires, for the acceptance of a draft, is not required on the marking of a check "good;" "certified checks" being taxed specifically in another way.

ERROR to the Circuit Court for the District of Massachusetts, in a suit by the Merchants' National Bank against the State National Bank, upon three checks of Mellen, Ward & Co., on the latter bank, marked "good" by its cashier, and given to the former bank; amounting, the three, to $600,000.

The case, as developed by admitted facts and by the plaintiff's evidence alone, was thus:

Both banks were associations organized under the National Currency Act of 1864; the State Bank with a capital, as its articles of association seemed to show, of $1,800,000, capable of being increased.

Under this National Currency Act the affairs of "every such association shall be managed by not less than five directors, one of whom shall be president." The directors during their whole term of office must be citizens of the

United States. Three-fourths of them must have resided in the State one year preceding their election, and reside there during their continuance in office. Each must own at least ten shares of stock, and as such owner he is personally liable to twice their value. All are to be sworn to the diligent and honest administration of the affairs of the association.

The total liabilities of any person, or firm or association, to the bank, shall never, by section twenty-nine of the act, exceed one-tenth of its capital. Bonds are to be deposited as security for the bills of the bank, which by section twenty-one may never exceed 90 per cent. of the bonds deposited. Section twenty-three enacts that no bank shall issue post notes, or *other* notes, to circulate as money than such as are authorized by the foregoing provisions of the act, and by various sections* care is taken to restrain the circulation, and to secure its redemption.

The act by its eighth section enacts that each association organized under it may, " by its board of directors appoint a president, vice-president, cashier, and other officers, *define their duties*," &c., &c. And it authorizes the association to exercise all such *incidental powers* as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; *by buying and selling* exchange, *coin*, and bullion, &c. The directors are empowered to regulate by by-laws the manner in which its general business shall be conducted. " And its usual business," says the same section, " shall be transacted *at* an office or banking-house located in the place specified in its organization certificate."

The directors of the State Bank defined the duties of their cashier, no otherwise than that by the 1st article of the by-laws he was to notify corporate meetings, and act as clerk at them; by article 7th was to be responsible for moneys, funds, and all other valuables of the bank; by article 11th

---

* §§ 22–27, 47, 50.

" was—(either he or the president)—to sign all conveyances of real estate voted by the directors; and by article 17th was —(either he or the president again)—to *sign* all contracts, *checks*, drafts, receipts," &c.; and also all indorsements necessary to be made by the bank.

Evidence, however, showed that, as matter of fact, the cashier of the Merchants' Bank was intrusted by its directors with large and comprehensive powers in dealing with the funds; so much so that instead of his transactions going regularly, as they occurred, through the books of the bank, and being credited or debited to the accounts to which they severally belonged, there was opened on the books of the bank one general account with the cashier, in which all the debits and the credits arising out of them, were entered to *his* debit or credit, that these transactions, thus entered on the books, embraced the giving of checks in lieu of bills where discounts were made; giving checks for the purchase of exchange; giving checks for money borrowed of other banks; that the amount of checks thus given for exchange, and in lieu of bank bills on discounts, during the five months prior to the transaction which was the subject of this suit, was $2,500,000, and in addition, that the amount of such checks given for money borrowed of other banks during the same period, was $1,547,000. And that regular printed blank checks were kept by the bank to facilitate these operations of their cashier.

So also evidence derived from the officers of twenty-two banks of Boston, in relation to the dealings of such banks with each other, showed a usage by which, without by-law or vote, powers were intrusted to cashiers of such banks to borrow and lend the money of their banks of and to each; to buy and sell exchange of and to each other, and in all such transactions to pledge the credit of their respective banks—usually by cashiers' check, sometimes by certificates of deposit or memoranda; that these transactions were frequent, involving large sums of money, and that they were uniformly conducted in faith of the implied powers of cashiers, without inquiry; but the usage shown with regard to

the powers exercised by the twenty-two cashiers failed wholly to show that any one cashier had ever used his powers to the purchase of gold coin, or had ever certified checks to be "good." Nor was it shown that the cashier of the State Bank had, either before or since the transactions on which this suit arose, ever certified as good the check of either depositor or stranger.

In fact, the Supreme Court of Massachusetts had decided in *Mussey* v. *Eagle Bank*\* that a *teller* could not so certify checks; placing the decision on grounds that seemed general. Such a power, said the court in that case, "is in fact a power to pledge the credit of the bank to its customers; a power which, by the constitution of a bank, can alone be exercised by its president and directors, unless specially delegated by them, and consequently it cannot be implied as a resulting duty or authority in any individual officer." Touching the matter of usage, the court said:

"But if a usage had been proved of the certifying by the teller that the check is good, to enable the holder to use it afterwards at his pleasure, such a usage would be bad and could not be upheld. It would give to bank checks, which are intended for immediate use and are the substitute for specie, in the ordinary transactions of business, the character of bills of exchange, payable to the bearer, the bank being the acceptor, and payable at an indefinite time. It would lead to loans to favored individuals, without the usual security. It would substitute checks for cash in the hands of tellers who receive them, and would confer the power upon a single officer to pledge the credit of the bank by the mere writing of his name; a power never contemplated by the legislature, nor intended to be conferred by the stockholders."

On the other hand, Congress, by its Internal Revenue Act of June 30, 1864,† under the head of "Banks and Banking," had laid "a duty of one-twelfth of one per cent. each month upon the average amount of circulation issued *by any bank*, &c., including as circulation all *certified* checks, and all

---

\* 9 Metcalf, 313.          † 13 Stat. at Large, 278.

notes and other obligations, *calculated* or intended to circulate or to be used as money."

In this state of pre-existent laws and usage, or absence of it, the plaintiffs' evidence showed that the Merchants' National Bank of Boston were applied to on the 22d of February, 1867, by Ward, Mellen & Co., brokers, with the statement that they were about to purchase in New York, "for responsible parties," three or four hundred thousand dollars of gold, and with the request that the Merchants' Bank would take and pay for the gold as it came from New York at $1.25 in currency (about 15 per cent. below the value at that time in currency); that these responsible parties would be prepared to take it in a few days, and that when thus taken away, it would go through probably some other bank, mentioning, perhaps, the State Bank.

There had been previous transactions in gold between the bank and Mellen, Ward & Co.; and the proposition now made was accepted upon the terms previously fixed in them, viz., that the gold should be a purchase by the bank, with a right of repurchase by Mellen, Ward & Co., on repayment of the cost and a premium "equivalent to interest on the amount invested by the bank on the gold."

Under this arrangement, the Merchants' Bank, on notice from Mellen, Ward & Co., on the 26th and 27th of February, took from the Second National Bank, and paid that bank for the same, $400,000 gold certificates, which, so far as appeared, had never been in the hands of or owned by Mellen, Ward & Co., and added the same to the gold of the bank. No obligation, note or memorandum accompanied the transaction as made; it being, as the direct testimony of the cashier and teller of the Merchants' Bank stated, and so far as the transaction appeared on its face, a sale of gold with a right to repurchase; although both the officers named, in written instruments, spoke of it as a loan.

On the 28th of February, Smith, the cashier of the State Bank, came to the Merchants' Bank, *in company with Carter,*

one of the firm of Mellen, Ward & Co., and said to the cashier there, " We have come in to get an amount of gold," and that he " would pay for the gold by certifying the checks when he saw that the gold was all right." The coin certificates to the amount of $400,000 were by the cashier of the Merchants' Bank, "passed out *to Mr. Smith, cashier of the State Bank.*" He counted them, and then handed to the cashier of the Merchants' Bank the two checks of Mellen, Ward & Co., on the State Bank, certified "Good, C. H. Smith, cashier." These checks were certified, not at the State Bank, but in the Merchants' Bank, "on the spot;" and after it was ascertained that the gold certificates received corresponded with the amount for which the checks had been drawn. They had no stamp on them but the usual two cent bank check stamp, that is to say no such stamp as the law requires for an acceptance. On the same day, Smith, the cashier of the State Bank (*Carter accompanying him*) applied to and received from the teller of the Merchants' Bank $60,000 more of gold, which the bank had previously purchased at the request of Mellen, Ward & Co., upon the same terms as above stated. The cashier was absent, and the teller took from Smith in payment a check for $75,000, similar to ones already mentioned, for the reason, as he says, that "I delivered the gold *to the cashier of the State Bank.*" Although it appeared that Mellen, Ward & Co. had been somewhat speculating in a copper stock, and had once obtained a loan on it from the Merchants' Bank, and that the cashier of the bank had a small interest with them in the stock, there seemed to be no proof in the case as it stood before this court, that is to say as it was presented by the plaintiff's evidence alone, that the cashier of the Merchants' Bank, in the delivery of the gold, or the cashier of the State Bank in certifying the checks in payment for it, acted otherwise than with good faith.

On or before the 1st of February following, Ward, Mellen & Co. failed. The subsequent history of the checks was thus given by Mr. Haven, the president of the plaintiff or Merchants' Bank.

"The first time I saw these checks was a little after twelve o'clock, on Friday, the 1st day of March, 1867. I took the checks in my hand a little after one o'clock, on that day, and presented them to the cashier of the State Bank. I said to him, 'I thought you were coming in to pay the money for these checks early this morning.' The cashier replied, 'Yes, I am going out now to attend to it, and get the money.' 'Get the money?' said I; 'didn't you have the money—the gold? were not the gold certificates delivered to you?' 'Yes,' said he; 'I *had* them here, but they are not here now. I am going out to get it, and will come in and attend to it.' I spoke rather abruptly, and said that he should do it immediately. He looked up and said, '*You hold the State Bank.*' I came back and laid the checks on the desk of the teller. About a quarter before two o'clock I took the checks into the directors' room of the State Bank. There were three or four gentlemen present. Either Mr. McGregor (who was a former president of the bank) or Mr. Dana, introduced me to the president of the bank, Mr. Stetson. I presented the checks to Mr. Stetson, the president. Mr. Stetson took the checks and deliberately read them, one by one, aloud to his directors, and those gentlemen who were present. He then said to me that they had not authorized their cashier to certify checks. He turned to Mr. McGregor and said, 'Have we, Mr. McGregor?' Mr. McGregor made no reply. I then said, 'He *has* certified checks, and those checks were given to the cashier of the Merchants' Bank for gold delivered to him, the property of the Merchants' Bank, and I want payment for that gold.' The gentlemen were considerably excited, and I wanted action. I said to them, 'I have just heard that there is trouble at the sub-treasury. I think you had better go down there; perhaps you will find your gold there, and if you wish it, I will go with you.' The gentlemen went, two of them, Mr. Stetson, the president of the bank, and Mr. McGregor, the ex-president, and we entered the room of the assistant treasurer. I think I introduced them, saying to the assistant treasurer, 'These gentlemen have come in to see if there has not been a large amount of gold placed to the credit of the State Bank.'"

Farther than as it was to be inferred from this testimony, it did not appear whether the State Bank had or had not

got the use of the gold. No proof was given that it did not go to that bank. However, that particular fact might have been, the State Bank refused to pay the checks of Mellen, Ward & Co., certified "good" by Smith, its cashier, and the Merchants' Bank sued in assumpsit for the amount; some of the counts being special on the transaction, others on a *quantum valebat, money had and received*, &c.

The case was tried before CLIFFORD, Presiding Justice, and the plaintiff having closed his case, the defendants moved the court to instruct the jury that the evidence was not sufficient to warrant them to find a verdict in favor of the plaintiff, under any of the counts in the declaration, and that as matter of law, the verdict of the jury upon each of them should be for the defendant; and this instruction the court gave.

The case being brought here on error, was elaborately argued at the last term.

*Messrs. S. Bartlett, J. G. Abbott, and W. M. Evarts, for the plaintiff in error:*

The contest turns, it is submitted, upon the following propositions, which, if successfully maintained by the plaintiff, are decisive on the question whether the case was properly withdrawn from the jury:

1. If in the absence of regulation by charter, by-law, or vote, and with no evidence as to the powers actually exercised by the cashier, and acquiesced in by the bank, nor of the powers usually intrusted to cashiers of banks established in the same community, the court can judicially know what the powers and duties of such cashiers are; yet it is a principle perfectly well settled, that under the foregoing circumstances (and even when by-laws and votes on this subject exist), evidence of the powers habitually or usually exercised by the cashier, with the knowledge and acquiescence of the bank, defines and establishes as to the public these powers, provided that the powers thus exercised may, without violation of the charter, be by the directors or corporation conferred on such cashier.

· 2. The evidence offered by the plaintiffs at the trial of the cause was competent and sufficient to have been submitted to the jury, on which they might lawfully find that the powers habitually or usually exercised by the defendants' cashier, with their knowledge, embraced the power to make for the defendants, the contracts declared on or some one or more of them, and that such powers might, without violation of the charter or law, be confided to such cashier.

1. The soundness of the first of the above propositions is obvious. To hold that the public may not safely confide in the existence of powers which by charter can be lawfully delegated, and which are openly exercised, but must investigate and find if those powers have been the subject of by-law or vote, and act accordingly, would not only suspend the business of commerce, but tend to make transactions with corporations a snare and a cheat.* So far as the public are concerned it is immaterial whether the powers thus exercised are in disregard of the by-laws of the corporation or not, provided they are within the corporate powers conferred by the charter.†

2. Then was the evidence offered by the plaintiffs competent and sufficient to be submitted to a jury in support of the claims made by the declaration?

The main original contract (laying aside for the present the question of certified checks), and of which evidence (sufficient at least to be submitted to the jury) was offered by the plaintiffs, was a contract for the purchase and delivery of gold by the plaintiffs to the defendants. The charters of both banks in terms authorized them to carry on the business of banking, by "*buying and selling exchange, coin and bullion,*" so that the contract set up by plaintiffs was within the

---

* Bank of the United States v. Dandridge, 12 Wheaton, 64–70; Minor v. Bank of Alexandria, 1 Peters, 46–70; Wild v. Bank of Passamaquoddy, 3 Mason. 505; Nicoll v. American Insurance Company, 3 Woodbury & Minot, · 530; (Maule, J.) in Smith v. Hull Glass Company, 8 C. B., 668, S. C. 11 Id. 897.

† Agar v. Athenæum Insurance Company, 3 C. B. (N. S.) 725; Royal Bank, &c. v. Turquand, 6 Ellis & Blackburn, 327; Prince of Wales Insurance Company v. Athenæum Insurance Company, 3 C. B. (N. S.) 757, note.

corporate powers of both parties. The transaction then being legitimate, and in its character forming part of the business of both banks, the principal question is, have the plaintiffs lost this large sum of money by improperly trusting in the assumed powers of the defendants' cashier. The buying and selling of gold must of course be intrusted, under general powers, to some officer of the bank. A vote of directors authorizing each daily or hourly transaction would be impracticable. In this attitude of the case, we ask attention to the evidence offered by us as to the powers habitually exercised with the knowledge of the defendants by their cashier, to the end that the correctness of the ruling withdrawing the case from the jury may be determined; and attention also to the evidence of the officers of numerous other National banks established at Boston, as to the powers and duties usually exercised by their cashiers in dealing with the public and with other banks. The competency of this evidence has been thus declared by this court.*

" Considering that all insurance companies in Boston have similar charters, and the same kind of officers to conduct their business, we think that there is competent evidence that presidents of insurance companies in that city are generally held out to the public as having authority to act in this matter, viz., to make oral insurance."

The legal principles that are to govern the application of the testimony in the case we submit, are these :

Where the authority of an agent is left to be inferred by the public from powers usually exercised by the agent, *it is sufficient if the transaction in question involves precisely the same general powers* though applied to a new subject-matter. Were this otherwise, the general authority to make purchases in the usual course of the business of the principal, could never be relied on, unless upon proof of previous purchase of the identical article, the authority to purchase which is in con-

---

* Commercial Insurance Company *v.* Union Insurance Company, 19 Howard, 318.

troversy. Thus if it be shown that the defendants' cashier had habitually, with the knowledge of the bank, dealt with the public as authorized to buy and sell exchange, and still more if that power is shown to have been habitually exercised by the cashiers of all other banks established in the same community and "having similar charters," then the power to buy and sell gold (the right to do both which is conferred by the same clause of the charter) may be inferred by the jury.

Again, if a cashier is shown to have usually or frequently *pledged in writing the credit of the bank* in the usual course of business, with the knowledge of the bank, and such is shown to be the usage of other banks, as before stated, it is evidence from which the jury may infer that he is authorized to pledge that credit in all transactions authorized by the charter, and which could lawfully be intrusted to a cashier.

It is not contended by the plaintiffs that a power to buy may be inferred from an exercise of a power to sell, however frequent that exercise may have been, nor that a power to indorse may be shown from numerous instances of signature as promissor. The contracts in such cases are wholly dissimilar; acts distinct in their nature. But when the powers exercised are shown to be of the same character, *involving both in form and substance the same identical obligation, and the same consequence to the principal,* and in the course of his business, it cannot be necessary to show that in their previous exercise they have been applied to contracts for the same article.*

The American Leading Cases† thus speak:

"With regard to the limits of the general agency, which is created by a series of acts or course of dealing, the language of Lord Eldon's, in *Davison* v. *Robertson*,‡ has generally been considered as defining the principle with accuracy. In that case the position had been stated that an indorsement *per* procuration required a special mandate, but Lord Eldon's opinion was,

---

* Tripp *v.* Swanzey Manufacturing Company, 13 Pickering, 291.
† Edition 1857, p. 573.                      ‡ 3 Dow, 219, 229.

that no such thing was absolutely necessary: 'for if *from the general nature* of the acts permitted to be done, the law would infer an authority; the law would say that such an authority might exist without a special mandate.' "

The author goes on to say:

" This is illustrated in *Commercial Bank of Erie* v. *Norton.*"*

In the case thus cited, Cowen, J., states the exact principles thus:

" It is not necessary, in order to constitute a general agent, that he should have done before *an act the same in specie with that in question.* If he has usually done *things of the same general character and effect* with the assent of his principals, that will be enough." ·

· The doctrine thus stated was in that case applied where the agent of a firm, who with their knowledge and assent, was in the habit of drawing bills and making notes and indorsements for them, had made an acceptance, *but no proof was offered* that he *had ever previously made an acceptance:* The principal was charged. The case is cited as sound, in Parson's Mercantile Law,† and Paley's Agency.‡  In *Watkins* v. *Vince,*§ Lord Ellenborough carried the doctrine so far as to hold that a son who had signed for his father in three or four instances and had accepted bills, could bind the father *by a guarantee.* In *Prescott* v. *Flinn,*‖ C. J. Tindall says:

" It may be admitted that an authority to draw does not *impart in itself* an authority to indorse bills, but still the evidence of such authority to draw is *not to be withheld from the jury, who are to determine on the whole evidence,* whether such authority to indorse exists or not."

The evidence to which these principles are to be applied, appears in the statement of the case.¶  It shows that the cashier of the defendants was intrusted by them with powers

---

the largest and most comprehensive in dealing with the funds of the bank, giving its checks, pledging its credit, and making its contracts and purchases. Similar powers were openly and habitually exercised by the cashiers of banks in Boston, in the dealings of such banks with each other.

In view of such proofs, we ask if it ought to be determined that there was *no* legal competent evidence proper to be submitted to a jury, from which they might infer that, as among the wide powers openly exercised by Smith, the defendants' cashier, in numerous instances and for large amounts, was the authority to purchase exchange, he had or not also intrusted to him the power to purchase gold, and thus to find their verdict for the plaintiffs upon the counts framed upon such purchase?

We next submit, that upon the evidence the question, whether the defendants' cashier, clothed as he was with the powers stated in the proofs, had or not the *incidental power* to certify the checks declared on, was fit to be submitted to the jury.

In discussing this point we assume that there was evidence competent to be submitted to the jury to show the large powers intrusted to the cashier to pledge the credit of the bank—that the jury might well find that he had power to make the purchase of gold from the plaintiffs, and that he might have given a cashier's check on his own bank, a certificate of deposit, or a credit for the purchase-money.

Now, the form of pledging the credit of the bank at the moment the gold was received, viz., by certifying the checks of the parties for whom the arrangement was made, is of the same character and nature as a cashier's certificate of deposit, checks, or memorandums of credit, referred to in the history as to usage. Like these, it is an absolute and not a contingent promise to pay, and in view of the wide powers exercised by the defendants' cashier, the jury had a legal right to infer that this mode of pledging the credit of the bank, suited as it was to the circumstances (the cashier having full authority to make the purchase), was within his delegated powers.

The view of the court below rests on the doctrine, that if a charter prescribes the mode in which the officers of the bank must act or contract, that mode must be strictly pursued, and the power cannot be delegated. But this doctrine has no application in this cause, since the National Currency Act prescribes neither the mode nor the officers by whom the acts or contracts necessary to the course of business shall be made, but merely confines the general oversight and management to a board of directors.

This precise question as to power of the directors to authorize other officers of a bank, by a general vote, to exercise in the name of the bank, *at all times*, the power to borrow money and give notes, has been raised and carefully discussed in a case where the charter, in terms, provided " the affairs of the company shall be conducted by the directors," and the careful judgment of Chief Justice Tilghman, displaying, as it does, the practical difficulties which would arise from a denial of the power, seems conclusive.*

If the power to borrow money, at all times, for the purposes of the bank, and give notes therefor, can be delegated by the directors to the cashier, the power to purchase exchange and gold, in pursuance of the charter, can be so delegated. Whether the power to delegate to a cashier authority to certify checks exist, has nowhere been settled. As to conferring such authority *on tellers by usage*, the power is negatived in Massachusetts,† while in New York it is settled that such power may be conferred,‡ and a statute of the United States recognizes certified checks, and makes them in common with the circulation subject of taxation.

Whether the control of the great leading business for which a bank is created, viz., loans and discounts, can be

---

* Ridgway *v.* Farmers' Bank, 12 Sergeant & Rawle, 256–261.   As to the incidental powers of banks to borrow money, see Beers *v.* Phœnix Glass Company, 14 Barbour, 358.

† Mussey *v.* Eagle Bank, 9 Met. 306.

‡ Farmers' and Mechanics' Bank of Kent County, Maryland *v.* The Butchers' and Drovers' Bank, 4 Duer, 219; affirmed on appeal, 16 New York, 125; Willets *v.* Phœnix Bank, 2 Duer, 121.

delegated, may be doubted.  The prevailing practice known and acted upon by the public, is to apply to a board of directors for discounts.  But it does not follow that the whole of the other functions of a bank can only be performed by a vote of directors, upon each hourly transaction.  The authorities cited above are repugnant to any such doctrine.

But if the power to certify was not under the evidence fit to have been submitted to the jury, still the right to recover the purchase-money for the gold, stands unaffected by the giving of the checks.  They were received in the faith that, in dealings of bank with bank, the defendants' cashier had authority to certify them.  If they were void, no payment has been made.  It is equivalent to a payment in forged bills.  The debt remains.

No proof was offered by defendants that the gold purchased of the plaintiffs was not carried to the defendants' bank and placed with their funds; although if it was not so, the onus is on the defendants.

Proof that the gold was so carried and placed is found in the occurrences on the occasion of the demand made at defendants' bank of its cashier and of its directors.  The cashier of the defendants admitted that he had had the gold certificates in their bank; and that the State Bank was held.  So at the interview of Mr. Haven with the defendants' directors, when he stated to them that their cashier had certified checks, and those checks were given to the cashier of the Merchants' Bank for gold delivered to him, the property of the Merchants' Bank, and that he wanted payment for that gold, there was no denial that the gold had been received by the State Bank, but merely a statement that the directors had not authorized their cashier to certify checks.

*Messrs. B. R. Curtis, C. B. Goodrich, and B. F. Thomas, contra, and in support of the ruling below:*

The main question is, whether the cashier had authority to bind the defendants in the contracts declared on.

I.  Had he authority to certify the checks?

It is clear that no *express* authority had been given to him

to do so. Certainly no such power was conferred upon him by the act of Congress, from which the corporation derives all its powers and functions; for by *it* the entire control and management of the bank are vested in the directors, and with this view, both as to qualifications and responsibility, their office and trust is most carefully guarded.

If, then, the cashier was authorized in any way to certify the checks, he must have been so through the action of the directors. But no such power was conferred upon him by any by-law; nor by any vote of the directors; no ratification or sanction by the directors as a board, or separately, of the use of such power by him; no evidence that he ever in a single instance, before or since the acts in question, made any certificate upon any check of depositor or stranger.

How then, if at all, have the directors clothed him with the power to make the contracts declared on? They had the power to appoint a cashier and to "define his duties." But they had no power to transfer or make over to him the duties and powers of the directors. They had power only to point out, and *define* what he was to do, not trenching upon but in just subordination to their own powers and duties.

Though the power to define the duties of the cashier is vested by the act of Congress with the directors, we concede that the appointment of a cashier devolves upon him various powers and duties. The inquiry then is as to their nature and extent.

Speaking in general terms, they are executive and ministerial, not discretionary or *quasi* judicial. His function is to carry into effect the contracts made by the directors, and to execute their orders. If in carrying into execution the contracts and orders of the directors, his acts sometimes assume the form of contracts, they are ancillary and accessory, and not substantive and independent agreements.

It is plain that the appointment of cashier does not confer upon the appointee any power, duty, or function which the courts of law, and especially this court, have said do not appertain to the office.

What, then, has been determined by this court on this subject?

In *Fleckner* v. *Bank of the United States,*\* the earliest case, the obligation of a bank for the acts of its cashier is limited to those done in the ordinary course of business intrusted to him.

In *Minor* v. *The Mechanics'. Bank of Alexandria,*† it was held that no usage, even under the sanction of the board of directors, would justify a cashier in allowing customers to overdraw.  The case at bar is not merely a case of overdrawing by a depositor, but a case of drawing to the amount of $500,000 by a firm who were not, so far as appears, depositors, and who had not and never had had funds in the bank.

In *Bank of the United States* v. *Dunn,*‡ this court held, that the president and cashier of a bank, acting together, had, no power to bind the bank by a representation to an indorser where there was collateral security, that he would not be bound by his indorsement.

*The United States* v. *The Bank of Columbus,*§ recognizes and affirms as settled law, that the making of a contract involving the payment of money, or the purchase or sale of property, is not within the ordinary business of a cashier, and that if a party relies upon such contract by a cashier, he must show (at the least) a special delegation of power from the directors.  The court say :

"The term, ordinary business, with direct reference to the duties of cashiers of banks, occurs frequently in English cases, and in the reports of the decisions of our State courts, and in no one of them has it been judicially allowed to comprehend a contract made by a cashier without an express delegation of power from a board of directors to do so, which involves the payment of money, unless it be such as has been loaned in the usual and

---

\* 8 Wheaton, 338.                  † 1 Peters, 46.

‡ 6 Id. 51, and see United States *v.* The Bank of Columbus, 21 Howard, 356.

§ 21 Howard, 356.

customary way. Nor has it ever been decided that a cashier could purchase or sell the property, or create an agency of any kind for a bank which he had not been authorized to make by those to whom has been confided the power to manage its business, both ordinary and extraordinary."

It is vain to say that the contract in that case was *ultra vires*. The case was neither argued nor decided on that ground, but was argued and decided on the power of a cashier to make the contract. The principles involved in the decision are therefore authority in the case at bar.

The leading case in Massachusetts, where the contracts sued on purport to have been made, is *Mussey* v. *The Eagle Bank*.* The case, though arising as to a check certified by a teller, in its reasonings and the principles affirmed, applies as well to those by a cashier. The argument made here,— that this certificate of " good," on the check, is but another form of the exercise of a usage, so common in banks, of granting a certificate of deposit of money to the credit of a third person, was made there. What say the court?

" We are of opinion, that usage of the one will not support the practice of the other. The two practices, while having the appearance of resemblance, and although one may be used for the same purpose as the other, in the form of a remittance, are, in their character, essentially distinct."

And the court show wherein they are so.

The cases decided in New York do not really touch the question of authority. They have no tendency to show that the power to certify checks was inherent *in the cashiers of banks in Massachusetts*, existing under the laws of the State, or of the United States.

It is true that the 17th article of the by-laws of the State Bank provides that " all contracts, checks, drafts, receipts, &c., shall be signed either by the cashier or by the president." But the duty of signing contracts is ministerial and executive, not discretionary. The power to sign, without

---

* *Supra*, 608.

more, excludes the idea of a power to make.  The contracts and the checks to be signed are the checks of the bank and not of third persons.*  The drawer of the check is the debtor to the payee.  It is his contract, he standing to the payee as the maker of a promissory note or acceptor of a bill of exchange.  The check does not contemplate or require acceptance, and, in the usual course, is not accepted.  Smith here put his name upon contracts, which had their existence as contracts when signed by Mellen, Ward & Co.  They were in no sense contracts made by the directors, or which had been prepared by them for signature by the cashier.

Nor does the production of a contract signed by the cashier furnish *primâ facie* evidence that the contract was made by the proper authority.  Though such presumption may attach to payments made or received by the cashier over the counter of the bank, or other acts within the scope of his ordinary business and duties, it is limited to them. No rule of law is better settled than that a party contracting with a corporation of limited and defined powers, or the servant or agent of such corporation of limited agency, is always put upon his inquiry as to the extent of the power of both principal and agent.†

The distinction between natural and political persons in this regard is obvious.  A natural person may appoint an agent to do what he may do himself.  Not so with corporations.  They can exercise no powers not delegated, and must use them in the mode prescribed by their charter. He who relies upon a contract as binding upon a corporation, when such contract can be made only by its directors, must show affirmatively not only that the directors made it, but that it is within the scope of their powers and duties.‡

But a like rule of agency applies even to natural persons. Under certain circumstances an authority arises to an agent

---

* Fearn *v.* Filica, 7 Manning & Granger, 513.

† See, among other cases, Lowell Savings Bank *v.* Winchester, 8 Allen, 109; Zabriskie *v.* Cleveland, 23 Howard, 398; Pearce *v.* Madison, 21 Id. 443; Salem Bank, *v.* Gloucester Bank, 17 Massachusetts, 1.

‡ Burnes *v.* Pennell, 2 House of Lords' Cases, 520, 521, 522.

to do a certain act, but you must show the occurrence of the circumstances before you can count upon his act. Familiar illustrations occur. *Ex. gr.*, the master of a ship may give a bottomry bond under certain circumstances; the lender must show the circumstances. The master may sell in case of necessity; the purchaser must show the necessity. The master may give a bill of lading for goods put on board; the holder must show that the goods were on board. So a power to draw and indorse bills for and in the name of the principal will not authorize a drawing or indorsing in his name for the accommodation of third persons.*

The plaintiffs argue that the defendants, by putting a cashier into the bank, and not defining or restricting his powers, held him out to the world as the organ of the bank for doing the business of banking, and that, therefore, any acts done by him in carrying on the business of banking, as receiving deposits or buying and selling gold, are at least *primâ facie* valid. But the directors have done no such thing; they put the cashier into their bank as *cashier*, they held him out as *cashier*, and nothing more. The appointment to the office of cashier was a limitation of his powers. Whosoever dealt with the bank was bound to know the law, and especially a bank organized under the same laws, and doing business at its side. The defendants neither did nor could hold themselves out except as a banking association organized under the act of Congress, with the powers given by and to be exercised in the manner prescribed by that act.

That the putting a cashier behind the counter of a bank gives him no power to bind the bank, by representing that he has power to do what he cannot lawfully do, is plain. There could be no effectual definition or restriction of the powers of an agent if his representation of what he is authorized to do is to bind the principal. Though as to statements of facts on matters falling clearly within the agent's

---

* See the distinctions set forth in 1 American Leading Cases, 4th ed., 549, Batty *v.* Carswell, Peck *v.* Harriott, and note.

sphere of power and duty, he may bind the principal; that is the outside limit. Something more then was necessary to be shown than putting Smith into the bank as cashier, and a failure to define all his duties.

If the power to make these contracts was not inherent in the office of cashier, and the directors have not defined or pointed it out as one of his functions, it could not spring out of their silence. It was not necessary for the directors to negative its existence, because there was neither law nor usage to require them.

Then, have the directors so conducted themselves as to their cashier and third persons, as to warrant them in believing that the cashier had been so authorized? They have not acquiesced in the use of the specific power, for there is no evidence that the cashier ever certified a check before or since he certified those in suit.

The plaintiffs' evidence is offered to show that defendants' cashier had been permitted to make contracts pledging the credit of the bank, and that it was the usage or course of business for cashiers in Boston to make such contracts. From the existence of a power to make the class of contracts testified of, they would infer a power to make the contracts sued upon. So far as the evidence concerns the conduct of the State Bank and its relations with its cashier, it tends to show that the cashier had, before these transactions, been accustomed to borrow money of other banks to make up deficiencies at the clearing-house and give his check therefor; to lend money for the same purpose, and receive a cashier's check therefor; to sell exchange on New York, and to draw on the bank's correspondent for the same; to buy exchange on New York, and give a cashier's check for the same, and (when discounts had been made) to give checks in lieu of bills to customers of the bank. But none of these acts, if proved to have been done by the cashier of his own motion, would have any tendency to show or warrant the jury in finding, that Smith had authority to go to the Merchants' Bank and certify checks of Mellen, Ward & Co., given to it in payment of a previous loan to them, or in payment for

gold which the Merchants' Bank was under contract to sell to them. The calling of the cashiers of twenty-two banks to prove the borrowing of other banks and giving checks therefor, and the purchase and sale of New York exchange, and the absence of evidence of the certifying of a single check by a cashier, is the most forcible of negatives pregnant. It shows not merely that there is no evidence in the case, but that none was to be had.

So far as the evidence tends to show a usage or course of business, it clearly marks and defines it, and the line of demarcation falls outside of the class of acts counted upon by the plaintiff.

But it is asserted that the classes of acts shown to have been done by the defendants' cashier, and the acts sued upon, though not alike in form, are alike in principle in this regard, that they both pledge the credit of the principal.

Seemingly there are few agencies, general or limited, which do not more or less concern and involve the credit of the principal; but a power to pledge the credit of the principal for one purpose has no tendency to show the power to pledge it for another and distinct purpose. If A. authorizes B. to buy cotton on time, and he buys wool, or even real estate, all these acts assume to pledge the credit of A., but only the first does pledge it. The law does not extend or expand the powers of agents by analogy. On no subject are its rules of limitation more rigid.

Moreover we object to what constitutes the principal part of the evidence of the plaintiffs, the testimony of the cashiers of banks in Boston, as to the powers exercised by those cashiers, as incompetent and immaterial. The plaintiff cannot show that the defendant bank had conferred a substantive power upon their cashier, by showing that cashiers of other banks used such power; *a fortiori* not by showing that cashiers of other banks used powers entirely distinct from the one relied upon.

In appointing a cashier, the directors charged him with the powers and duties which the law had declared to be inherent in the office of cashier. As to modes and forms of

business, they authorized him to follow the usage and custom of the city of the bank's location, so far as they did not conflict with positive law. But these were the outside limits. To say because cashiers of debtor banks borrow money of creditor banks at the clearing-house to make up their balances, or buy or sell exchange on New York, that therefore the cashier of the defendant bank could by certifying checks pledge the credit of the bank without limit, for persons who were not depositors at the bank, who had no funds there, lending in effect not merely more than a tenth, but nearly one-third of the bank's capital, contrary to the 29th section of the National Currency Act, by acts done outside of the banking-house or office where its business was by law to be transacted, without the knowledge of the directors or any one of them, or of any other officer of the bank, without any consideration to the bank for the responsibility assumed, paid or promised—is not merely to make the cashier the bank, but to take the bottom out of the bank itself.

Mellen, Ward & Co. not being depositors, having no account with the State Bank, had no right to draw a check upon that bank, and its cashier had no power to receive or recognize it. Paying the check of a depositor to the extent of his deposit is but paying as the bank has agreed to pay. Paying the check of a non-depositor, or guaranteeing its payment, is doing just what the bank had never agreed to do. Nor does it follow because the cashier might pay or guaranty the payment of a check where there were funds, he could do it where there were not.* There is no evidence of any agreement of Mellen, Ward & Co. and the defendants' cashier to place the gold coin or gold certificates in the defendant bank. Mr. Haven, indeed, the president of the Merchants' Bank, testifies that at noon on the 1st of March, in the State Bank, he asked Smith, its cashier, "if he did

---

* Farmers' and Mechanics' Bank v. Butchers' and Drovers' Bank, 16 New York, 125; Schooner Freeman v. Buckingham, 18 Howard, 182; Lowell Savings Bank v. Winchester, 8 Allen, 109; Grant v. Norway, 10 Common Bench, 665.

not have the money? if the gold certificates were not delivered to him?" and that Smith said: "Yes, I had them here, but they are not here now." Giving full force to this testimony, it is, that Smith had the certificates with him in the bank edifice, not that they were ever mingled with the funds of the bank. As the cashier had no authority to buy the gold for the State Bank, or contract for its deposit there, that bank could not be responsible for it, until with the knowledge and assent of the directors it had been mingled with the bank's own funds.* And as the cashier had no authority to deal with the gold, either by purchase or receiving it on deposit for Mellen, Ward & Co. to draw upon it, he clearly has not the power to bind the bank by any declarations concerning the transaction. In addition to which, when Smith made this declaration he was not acting as agent of the bank.

If it be said that the certificate of the cashier is *primâ facie* evidence that the drawers were depositors, and had funds to meet the checks, it comes to the same thing, as asserting that a cashier has power to certify where the drawers were not depositors, or had no credit at the bank.

The relation created by depositing money in a bank is that of debtor and creditor,—the depositor, the creditor; the bank, the debtor. The money deposited becomes the money of the bank. The depositor has for it the promise of the bank to pay him so much money on his orders or checks. The relation is the result, then, of contract. When a cashier or teller pays the check of a depositor having credit at the bank, he pays as the bank has promised; every dollar that is thus paid out discharges so much of the debt due the depositor from the bank. The cashier is but executing the contract of the bank. When the cashier accepts the draft or check of a non-depositor, a new and different contract is entered into. The bank agrees to advance or lend so much money to the drawer. The bank becomes the creditor, and

---

* Atlantic Bank *v.* Merchants' Bank, 10 Gray, 532; Skinner *v.* Merchants' Bank, 4 Allen, 290.

the drawer of the check the debtor. It is not enough to say the two things differ; there is no resemblance between them. The bank may be very willing to have A. its creditor, and very unwilling to have him its debtor.

A specific objection to the giving to the cashier the power to accept these drafts, or the exercise of it by the directors themselves, is, that it clearly contravenes the provisions of the 29th section of the Banking Act. It would create a liability of Mellen, Ward & Co. to the defendant bank, exceeding one-tenth part of the capital of the bank; to the extent, indeed, of nearly a third of the capital.

II. Then, as to the sale of gold certificates and coin to the State Bank through its agent and cashier, Smith. The considerations, as to the power of the cashier to enter into contracts by certifying the checks, already suggested, apply with equal force here. The cashier had no authority to make the purchase; none under the act of Congress, none under the by-laws, none under any vote of the directors, none under the oral consent of the directors, or any one of them, none under any practice or any one precedent of his own. There is no evidence that the State Bank ever engaged in the business of buying and selling gold, or so held themselves out to the public. Though the statute *permits* it does not *require* the bank to deal in gold. It is for the directors to decide whether they will enter upon this business or not; without their consent, express or implied, the cashier could not do it.

If the cashier had made the most formal purchase of the plaintiffs' gold, the defendants could not be holden. If the directors had received the gold coin or certificates, and had not within a reasonable time, or on reasonable request, returned them, the bank might be charged with their value. But the putting them into the hands of Smith (if proved) is nothing; for if Smith had no authority to make the contract for the gold, he certainly was not the defendants' agent to receive the gold. Nor would the delivery to, and receipt of the gold or gold certificates by the defendants' cashier, when absent from the bank, create a deposit for Mellen, Ward & Co., or render the bank liable on any im-

plied assumpsit to the owner. If one delivers money to the cashier of a bank when absent from the bank, to deposit, or to pay a note in the bank, he makes the cashier his agent to deposit or pay; and if the money be lost or stolen before it reaches the bank, the bank is not liable.[*]

This rule, applicable to banks generally, has peculiar force to one organized under the United States Banking Act, which requires that "its usual business shall be transacted *at* an office or banking-house located in the place specified in its organization certificate."

If the cashier of the State Bank had the power to purchase, the Merchants' Bank had no right to sell. Mellen, Ward & Co. had a right to the gold at any time by paying the advance. The Merchants' Bank had the right at any time to demand the payment of the money. Interest was to be paid on the sum advanced. No matter what name the parties give to the transaction, these essential features remain and show conclusively a loan. But whether a loan or conditional sale is not important. Mellen, Ward & Co., it is certain, had a right to receive the gold upon payment of the amount advanced, with interest. Neither the bank nor Smith had such right. If Smith was not an agent to contract, he was not to receive. At the time of the delivery, Carter and Smith were present. Carter said he had come in for his gold; it was delivered. The delivery in contemplation of law was to Carter, the only person present competent to receive. Whether the manual caption was by Carter or Smith is immaterial.[†]

The payment, if any was made, was made by Mellen, Ward & Co. The checks were their checks, none the less after the certificates than before. If the word " good " can be treated as a guaranty by the bank, Mellen, Ward & Co. were the principals. If the checks, when certified, were acceptances of the bank, yet in contemplation of law they were drafts on and to be paid from their funds in the hands

---

[*] Manhattan Company *v.* Lydig, 4 Johnson, 377; Bullard *v.* Randall, 1 Gray, 605; Thatcher *v.* Bank of State of New York, 5 Sandford, 121.

[†] Frost *v.* Cloutman et ux., 7 New Hampshire, 15.

of the bank, charged to account of Mellen, Ward & Co., and of course their property.

: Other objections, somewhat more technical, may be suggested.

(*a*) . The certificates having been made by the cashier when absent from the banking-house, were in violation of the 8th section of the act of Congress requiring its business to be done at its office or banking-house. None of the presumptions which would attach to payments made, or other acts done over the bank's counter, apply to these.

(*b*) Certified checks are against the policy of the Banking Act, which prohibits the issue of bills exceeding 90 per cent. of the bonds deposited. It is familiar history that certified checks have been used chiefly, if not wholly, to eke out a currency larger than the act allows.

They are equally illegal and void, as within the prohibition of the 23d section of the Banking Act, which forbids any banking association to issue post notes, or any *other notes*, to circulate as money than such as are authorized by the act. It is sufficient to bring the certified checks within the provision that they are capable of being so used, and that the general purpose for which they had been used was a substitute for bills.

(*c*) The written contracts relied upon could not be offered in evidence, because not duly stamped. If the certificates were valid, and to bind the bank, they engrafted upon the checks new and distinct contracts, to wit, acceptances of bills, and must be stamped as such.

*Reply:* The defendant's view is, that in the absence of definition by charter, by-law, or vote, the law prescribes the extent and limit of the powers of a cashier. But this view is not supported either by principle or authority.

Doubtless there exist classes of commercial agencies, whose powers and duties are so fixed and defined by the common law, after ages of judicial proof and investigation, that they are not only no longer the subject of inquiry but cannot be varied and controlled as against the public by

proof of special contract limiting those powers.   Such are
partners, shipmasters, brokers, factors, &c.   The powers
and duties of such agents are fixed by the law, not in the
absence of powers prescribed by writing or contract (as is
claimed for cashiers), but in utter disregard of such prescrip-
tion.   But a cashier, the offspring of modern commerce, is,
as stated by Baron Parke of bill brokers, " not a character
known to the law with certain prescribed duties, but his
employment is one that depends entirely on the course of
dealing.   It may differ in different parts of the country.
The nature of these powers and duties in any instance, is a
question of fact, and is to be determined by the usage and
course of dealing in the particular place."*

That this is the precise doctrine applicable to cashiers is
obvious, since even the defendants must admit that, in the
absence of regulations by charter, by-law, or vote, the powers
and duties of a cashier may be shown by the course of deal-
ing lawfully committed to his charge by the bank.   Now if
this be so, defendants' proposition must be, that in the ab-
sence of all regulation by charter or vote, and of all evidence
of the powers actually exercised by a cashier with the knowl-
edge and ratification of the bank, the law prescribes the
powers of a cashier.   The value of which doctrine, if true,
will appear, whensoever such a state of facts shall (if ever)
occur.

But in no one of the cases decided by this court and re-
lied on by the defendants, has the court attempted to *rest
its decision* upon an assumed judicial knowledge of the com-
mon law powers and duties of a cashier, where the acts in
question were within the pale of the charter.   There are in
several of the cases *recitals* of what the court suppose are
the ordinary powers of cashiers, but no judicial decision has
turned upon those recitals.

In *Fleckner* v. *Bank of United States,*† an early case, the ques-
tion was, whether a cashier had a right to indorse the note

---

* Foster *v.* Pearson, 1 Crompton, Meeson & Roscoe, 858.
† 8 Wheaton, 360–1–2.

in suit.   In the course of the judgment it is said: "We are *very much inclined to think*" that the indorsement falls within the ordinary duties and rights of a cashier, *at least if his office be like that of similar institutions.*   "The cashier is usually," &c. *"It does not seem too much to infer."*   "But waiving this consideration."   *The case is decided on another ground.*

*Minor* v. *Bank of Alexandria,** was debt on a cashier's bond; the defence set up a usage sanctioned by directors, to allow parties to overdraw, and the case was decided on the ground that it was "a usage to misapply the funds of the bank and connive at their withdrawal, *and could not be supported by any vote of the directors, however formal.*"   The case states with great fulness the rights of the public in dealing with the officers of banks.   "The ordinary usage and practice of a bank, in the absence of counter proof, must be supposed to result from regulations prescribed by the board of directors, &c.   It *would be not only inconvenient, but perilous, for the customers or any other persons dealing with the bank, to transact their business with the officers upon any other presumption.*   The officers of a bank are held out to the public as having authority to act according to the general usage, practice, and course of their business, and their acts within the scope of such usage, would bind the bank in favor of third persons having no other knowledge."

Then follows next the case of *Bank of the United States* v. *Dunn,*† in which the defence was set up by an indorser that prior to the discount of the note, both the president and cashier represented to him that the note was secured and his liability nominal.   The evidence was held as inadmissible, both as contradicting the note and upon the ground that "*all discounts are made under the authority of directors, and it is for them to fix any conditions.*"   "The agreement was not made by persons who have power to bind the bank *in such cases,* nor have they power to bind the bank except in discharge of the ordinary duties."   There is no other or further remark in the case as to powers of cashiers.

---

* 1 Peters, 72.                    † 6 Peters, 51.

The last case is the *United States* v. *Bank of Columbus.**
The question at issue was the authority of the cashier to
contract with the United States in the name of the bank for
the gratuitous transfer of $100,000 from New York to New
Orleans.    The important feature of the case as showing that
it really decided a question *of corporate powers* is, that there
was no offer of evidence to show the extent and character of
the functions actually intrusted in the course of its business
by this bank to its cashier, from which the inference might
be drawn whether the bank had or had not intrusted him
with powers involving the same principle.

It has been determined by the same judge who delivered
the opinion of this court in *United States Bank* v. *Dunn*,
relied on by defendants, that " the cashier of a bank author-
ized by its charter to deal in bills of exchange, may accept
such bills as the agent of the bank.    *This is in the scope of
his agency*, and is sanctioned by universal usage."†

It is argued :

(*a*) That in view of the testimony as to the transaction by
which the gold was delivered to the defendants' cashier, it
was not and could not be intended or legally held to be a
sale or delivery of the gold by the plaintiffs to the defend-
ants.

(*b*) That as a matter of law the transaction by which the
plaintiffs originally received the gold, under the arrange-
ment with Mellen, Ward & Co., must be held to be a loan
by the plaintiffs on a pledge of the gold, and that, considered
as a loan, it violated the provisions of section twenty-nine
of the National Currency Act, and by reason thereof the
plaintiffs cannot by law maintain a suit for the price of the
gold under the sale to defendants.

1st. The ground on which the defendants assert that the
question whether there was a sale of gold to defendants, is
not to be submitted to the jury, is that there was in legal

---

\* 21 Howard, 356.

† Lafayette Bank *v.* State Bank of Illinois, 4 McLean, 208.   See also
Sturges *v.* Bank of Circleville, 11 Ohio State, 153.

contemplation no evidence of such sale, but that the court must rule, as matter of law, that it was a sale and delivery to Mellen, Ward & Co.

This view assumes, for the purposes of the argument, that the contract of plaintiffs with Mellen, Ward & Co. was a contract to purchase the gold, with an agreement as to the right of Mellen, Ward & Co. to repurchase it. Now this right to repurchase was capable of being transferred to the defendants. Indeed the testimony shows that at the outset, it was agreed or contemplated that it would be so transferred "in the course of a few days, and that the gold, when taken away, would go through, probably, some other bank, mentioning, perhaps, the State Bank." The transfer of this right to the State Bank (within two days) was, in fact accomplished. There was a transfer to the State Bank of Mellen, Ward & Co.'s right to repurchase the gold, and an exercise of that right by their cashier. Nor does the fact that the attempted payment was by checks of Mellen, Ward & Co. certified by the defendants' cashier negative the view that the State Bank were purchasers. The inference, without further evidence, would be strong that they made the same arrangement with Mellen, Ward & Co. as had been previously made with them by the plaintiffs (perhaps upon easier terms), as they agreed to pay the plaintiffs precisely what the plaintiffs had paid, viz., 125 per cent. The moment that the defendants got the gold, they had funds in their hands, and the certified checks could be drawn against those funds, and were drawn for the identical amount which the plaintiffs had agreed originally with Mellen, Ward & Co. to pay.

But however all this might have appeared to a jury, it was a question to be submitted to them.

2d. As to the defendants' other proposition, that the arrangement between the plaintiffs and Mellen, Ward & Co. must in law be held to be a loan, with a pledge of the gold as security, it is submitted, that if there be any evidence of the amount of their capital stock upon which to rest the averments that if it were a loan, it exceeded

the quantum permitted by the 29th section of the National Currency Act, such evidence was for a jury and not for a court.

Certain features of the transaction are relied on by the defendants which, if there were no direct evidence of what the exact contract was, and that it was intended by both parties to be a purchase and not a loan, might support, with more or less strength, the position that in law such features would constitute a loan. But the direct evidence of the terms of the contract negatives any inference which the jury might otherwise draw from these detached features. In such a conflict the question is for the jury, with instructions as to what facts, if found by them, would in law constitute a loan, and what a purchase.

But assume that the court or a jury should arrive at the conclusion that the transaction was a loan accompanied by a pledge, can the State Bank avoid their contract to pay the agreed price of their purchase of the pledge from us (an agreement made with the assent of the pledgor) on the ground that we received the pledge under a contract with the pledgor, which is illegal? Or can a party, who has accepted the draft of a pledgor given in settlement of a transaction which is an infraction of a statute, set up the illegality of that transaction to avoid his acceptance?

The minor objections are of small weight.

(a) The requirement that the "*usual* business" of the bank is to be transacted at its banking-house, means that the bank shall not carry on banking in distant places. Under the construction of the other side, how could two banks ever conclude any business between *themselves?* It would have to be done *at* the banking-house of one, and so *out* of the banking-house of the other. This business was done at the banking-house of the Merchants' Bank.

(b) "Certified checks" are indirectly authorized by Congress, by being taxed. If they contravene the National Banking Act they do so by leave of the legislature.

(c) Being specifically taxed they do not require a stamp as acceptances.

Mr. Justice SWAYNE delivered the opinion of the court.

This is a writ of error to the Circuit Court of the United States for the District of Massachusetts. The plaintiff in error was the plaintiff in the court below. It appears, by the bill of exceptions, that upon the evidence in behalf of the plaintiff being closed, the defendant's counsel moved the court to instruct the jury that it was not sufficient to warrant them to find a verdict for the plaintiff upon either of the counts in the declaration. This instruction was given. The jury found for the defendant. The plaintiff excepted, and has brought that instruction here for review. This renders it necessary to examine the entire case as presented in the record. According to the settled practice in the courts of the United States, it was proper to give the instruction if it were clear the plaintiff could not recover. It would have been idle to proceed further when such must be the inevitable result. The practice is a wise one. It saves time and costs; it gives the certainty of applied science to the results of judicial investigation; it draws clearly the line which separates the provinces of the judge and the jury, and fixes where it belongs the responsibility which should be assumed by the court. The facts disclosed in the bill of exceptions are neither numerous nor complicated. The defendant called no witnesses. There is no conflict in the testimony. The questions which it is our duty to examine are questions of law. None are made upon the pleadings, and it is unnecessary to consider them. It is sufficient to remark, that the declaration is so framed as to meet the case in every legal aspect which it can assume.

On the 26th of February, 1867, Fuller, the plaintiff's cashier, received from the Second National Bank of Boston $200,000 of gold certificates, and paid the bank, upon their delivery, the amount of their face and a premium of 25 per cent. Payment was made in currency and legal tender notes. The next day he received from the same bank $200,000 more of like certificates, and paid for them at the same rate in currency and a ticket of credit by the Merchants' Bank in favor of the National Bank for $175,000. Both transactions were

pursuant to an arrangement with Mellen, Ward & Co., brokers, in Boston. The market premium upon gold at that time was 40 per cent. It was understood between Fuller, the cashier, and Mellen, Ward & Co., that the latter might receive the same amount of gold from the Merchants' Bank, at any time thereafter, by paying the amount advanced, compensation for the trouble the bank had incurred, and interest at the rate of six per cent. There had been like transactions upon those terms between the parties prior to that time. The president of the bank was consulted in advance as to both the purchases from the Second National Bank, and approved them. The following testimony is taken from the record:

"George H. Davis testified as follows: I am the paying teller of the Merchants' Bank. From about the 1st of January, 1867, and previous to the 23d of February, the bank several times received gold, or gold certificates from Mellen, Ward & Co., for which it paid currency at the rate of $125 for $100 in gold. At that time they had deposited in the bank about $90,000 in gold. No note, memorandum, or check was taken connected with it in any way. The gold was added to the gold of the bank; on my cash book it was added to the item of gold, and the gold was mixed with the gold of the bank in the vault. If it consisted of certificates, they were put in a pocket-book kept in my trunk with other certificates and bills. (The paying teller's book was put in, and from the entries in it on the 26th, 27th, and 28th of February, 1867, it appeared that the gold received from Mellen, Ward & Co. was added to the gold of the bank.)"

On the 28th day of February, Carter, of the firm of Mellen, Ward & Co., and Smith, the cashier of the State Bank, called together at the Merchants' Bank. Carter said to Fuller, "We have come in for gold." Smith, the cashier, said, "We have come to get an amount of gold," and that he would "pay for it by certifying these checks," referring to two papers which Carter held in his hand. The teller handed Fuller 84 gold certificates of $5000 each, making the sum of $420,000. Fuller announced the amount. Smith said

that was the amount wanted, and the amount covered by the checks. He received the certificates, certified the checks, and handed them over to the plaintiff's cashier. They were drawn by Mellen, Ward & Co. upon the State National Bank in favor of Fuller, the plaintiff's cashier, or order, and were certified "Good; C. H. Smith, cashier." One was for $250,000, and the other for $275,000. Smith thereupon left the bank with the certificates in his possession. Nothing was said by Fuller to Carter, or by Carter to Fuller, in relation to the checks, and Fuller did not know what checks Smith referred to until they were delivered to him. Smith did not certify or deliver the checks until he had got possession and control of the funds upon which his certificates were apparently founded, and this was known to the plaintiff's agent when he received the checks. Later, on the same day, Smith and Carter called again at the Merchants' Bank. Fuller was absent. Smith received $60,000 more of gold and gold certificates from the teller, and gave in return a check for $75,000, drawn by Mellen, Ward & Co. on the State Bank, payable to "gold or bearer." Like the two previous checks, it was certified "Good; C. H. Smith, cashier." This arrangement was in pursuance of the same agreement as that under which the gold certificates were delivered in the earlier part of the day. Both transactions were alike within its scope.

On the 1st of March, Havens, the president of the Merchants' Bank, called at the State Bank and complained that Smith had not paid the checks. Smith said he was going out to get the money. Havens inquired, "Didn't you have the money—the gold? Were not gold certificates delivered to you?" He answered, "Yes; I had them here, but they are not here now. I am going out to get it, and will come in and attend to it." Subsequently, in the same conversation, he said, "You hold the State Bank." Later in the day Havens called upon Stetson, the president of the State Bank. Stetson denied that Smith was authorized to certify the checks, and appealed to a director who was present. The director was silent. In an account which Fuller ren-

dered to Mellen, Ward & Co. after their failure, showing the disposition of various collaterals which Mellen, Ward & Co. had deposited from time to time with the Merchants' Bank, the amount paid for gold was put down as a loan, and interest was charged, but in his testimony before the jury he denied that the money was loaned, and insisted that the gold was bought by the Merchants' Bank. The agreement between Mellen, Ward & Co. and the Merchants' Bank rested wholly in parol. No written voucher was given or received on either side touching any of the transactions between the parties. The record discloses nothing else in this connection which it is material to consider.

The State Bank was organized under the act of Congress "to provide a national currency," &c., of the 3d of June, 1864.* The eighth section of that act authorizes such associations. by their directors, to appoint a cashier and other officers, and to exercise, "under this act, all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; by obtaining, issuing, and circulating notes, according to the provisions of this act," &c. It is further provided that the directors may, by by-laws, regulate the manner in which its business shall be conducted and its franchises enjoyed; and that its general business shall be transacted at an office "located in the place specified in its organization certificate."

The 5th of the articles of association authorizes the board of directors to appoint a cashier and such other officers as may be necessary, and to define their duties. The 7th by-law declares that the cashier "shall be responsible for the moneys, funds, and other valuables of the bank, and shall give bond," &c. The 17th by-law requires that all "contracts, checks, drafts, receipts, &c., shall be signed by

---

* 13 Stat. at Large, 99.

the cashier or by the president, and that all indorsements necessary to be made by the bank shall be under the hand of the cashier or president," unless absent.

The by-laws contain nothing further upon this subject. The directors failed to define more specifically the powers and duties of the cashier.

Smith, the defendant's cashier, exercised habitually very large powers without any special delegation of authority. An account was kept on the books of the bank with him as cashier, which represented these transactions, and printed blank checks were kept in the bank to facilitate them. The checks given by him for the proceeds of bills discounted and for the purchase of exchange during the five months preceding the 23d of February, 1867, amounted in the aggregate to two and a half millions of dollars. This was exclusive of his clearing-house checks. His checks for money borrowed of other banks, during the six months preceding the same 23d of February, amounted to one million five hundred and forty-seven thousand dollars. A large number of the cashiers of other banks in Boston were examined, and testified that they exercised the same powers under like circumstances. There is no proof that either they or Smith ever certified checks. It is not shown what became of the gold. Perhaps some light is thrown on the subject by the remark of the president of the Merchants' Bank to the president of the State Bank, "that the latter had better go to the sub-treasury, and that he would perhaps find his gold there." We find no reason to doubt that both banks, as represented by their cashiers, acted in entire good faith throughout the transactions, until they were closed by the delivery of the last of the certified checks. Neither could then have anticipated the difficulties and the conflict which subsequently arose.

The first question presented for our consideration is, what was the title of the plaintiff, and what were the rights of Mellen, Ward & Co., in respect to the gold certificates delivered by the Second National Bank to the Merchants'

Bank? No very searching analysis of the facts disclosed is necessary to enable us to find a satisfactory answer to this inquiry. It does not appear that Mellen, Ward & Co. had any connection with the certificates received from the Second National Bank until after the plaintiff took the action which they invoked, and came into possession of the property.

The Merchants' Bank applied for them, bought them, paid for them, received them, and deposited them with its other assets of like character. It does not appear that any special mark was put upon them, or that anything was done to distinguish them from the other effects of the bank with which they were mingled. Upon the face of the transaction it was a simple sale by the Second National Bank, whereby the entire title and property became vested in the plaintiff. But gold was then at a premium of 40 per cent. in currency. The Merchants' Bank paid but 25, according to the contract between the bank and Mellen, Ward & Co. The latter were to pay, and it is to be presumed did pay, the additional 15 per cent. This was a part of the consideration upon which the Merchants' Bank entered into the contract. It is evident that the bank did not agree to deliver to Mellen, Ward & Co. the identical gold certificates which were purchased, but gold, or its equivalent in certificates to the same amount, and any gold, or any certificates would have satisfied the contract. The bank cannot, therefore, be regarded as holding the certificates in pledge. The want of the element, that the identical certificates were to be delivered, is conclusive against that view of the subject. If Mellen, Ward & Co. had tendered performance and called for gold, and the bank had failed to respond, Mellen, Ward & Co. could have sustained an action for the breach of the contract. But they could not have maintained detinue, trover, or replevin against the bank. The real character of the transaction was, that the bank took the title and entire property, but Mellen, Ward & Co. had the right to purchase from the bank the like amount of gold, or its equivalent in certificates, according to the terms of the contract, which were,

that they should pay what the bank paid, compensation for its trouble, and interest from the time the purchase by the bank was made.

In respect to the $60,000 of gold and gold certificates delivered by the teller in the absence of the cashier, and the excess of gold certificates over $400,000 delivered by the cashier, the facts are substantially the same as those in regard to the $400,000, except that the excess of certificates, and what was delivered by the teller, had reference to gold and gold certificates deposited in the bank by Mellen, Ward & Co. This difference is not material. With this qualification the same remarks apply which have been made touching the $400,000 of certificates, and we are led to the same legal conclusions.

The transactions between the State Bank and the Merchants' Bank were apparently of the same character as that between the Merchants' Bank and the Second National Bank. What the understanding between Mellen, Ward & Co. and the defendant was is not disclosed in the evidence. But it is fairly to be inferred that it was the same as that between them and the Merchants' Bank. When the arrangement was proposed by Carter to Fuller, on the 22d of February, Carter said that "when the gold was taken from the Merchants' Bank he thought it would go through some other bank or banks." The assent of Mellen, Ward & Co. to the sale to the State Bank by the Merchants' Bank extinguished their claim upon the latter. The Merchants' Bank certainly had a title of some kind, and whatever it was it passed to the State Bank; unless the contract was void, because the State Bank had no corporate power, or its cashier had no authority to make the purchase. The act of Congress expressly authorizes the banks created under it to buy and sell coin. No question of *ultra vires* is therefore involved.

If the Merchants' Bank held the certificates as a pledge it had a special property which might be sold and assigned. The assignee in such cases becomes invested with all the legal rights which belonged to the assignor. Such is the

rule of the common law, and it has subsisted from an early period.*

But we are entirely satisfied with the other view we have expressed upon the subject. *Modus et conventio vincunt legem.*

It is insisted by the defendant's counsel that the transaction was a loan to Mellen, Ward & Co. As the bank parted with its title, if there were a loan in the eye of the law, it would not in any wise affect the conclusions at which we have arrived.

Recurring to the subject of the authority of the cashier of the State Bank to make the purchase, and excluding from consideration for the present the certified checks, three views, we think, may be properly taken of the case in this aspect.

1. If the certificates and the gold actually went into the State Bank, as was admitted by Smith to Havens, then the bank was liable for money had and received, whatever may have been the defect in the authority of the cashier to make the purchase, and this question should have been submitted to the jury.

2. It should have been left to the jury to determine whether, from the evidence as to the powers exercised by the cashier, with the knowledge and acquiescence of the directors, and the usage of other banks in the same city, it might not be fairly inferred that Smith had authority to bind the defendant by the contract which he made with the Merchants' Bank.

3. Where a party deals with a corporation in good faith— the transaction is not *ultra vires*—and he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists.

If the contract can be valid under any circumstances, an

---

* Mores *v.* Conham, Owen, 123; Anon., 2d Salkeld, 522; Coggs *v.* Bernard, 3d Id. 268; Whitaker *v.* Sumner, 20 Pickering, 399, 405; Thompson *v.* Patrick, 4 Watts, 415; Story on Bailments, § 324.

innocent party in such a case has a right to presume their existence, and the corporation is estopped to deny them.

The jury should have been instructed to apply this rule to the evidence before them.

The principle has become axiomatic in the law of corporations, and by no tribunal has it been applied with more firmness and vigor than by this court.*

Corporations are liable for every wrong of which they are guilty, and in such cases the doctrine of *ultra vires* has no application.†

Corporations are liable for the acts of their servants while engaged in the business of their employment in the same manner and to the same extent that individuals are liable under like circumstances.‡

Estoppel *in pais* presupposes an error or a fault and implies an act in itself invalid. The rule proceeds upon the consideration that the author of the misfortune shall not himself escape the consequences and cast the burden upon another.§ Smith was the cashier of the State Bank. As such he approached the Merchants' Bank. The bank did not approach him. Upon the faith of his acts and declarations it parted with its property. The misfortune occurred through him, and as the case appears in the record, upon

---

* Supervisors *v.* Schenck, 5 Wallace, 784; Knox Co. *v.* Aspinwall, 21 Howard, 539; Bissell *v.* Jeffersonville, 24 Id. 288; Moran *v.* Commissioners, 2 Black, 722; Gelpcke *v.* Dubuque, 1 Wallace, 203; Mercer Co. *v.* Hacket, Id. 93; Mayor *v.* Lord, 9 Id. 414; Royal British Bank *v.* Turquand, 6 Ellis & Blackburn, Q. B. & Ex. 327; The Farmers' Loan and Trust Co. *v.* Curtis, 3 Selden, 466; Stoney *v.* American Life Ins. Co., 11 Paige, 635; Society for Savings *v.* New London, 29 Connecticut, 174; Commonwealth *v.* The City of Pittsburg, 34 Pennsylvania State, 497; Commonwealth *v.* Allegheny County, 37 Id. 287.

† Philadelphia and Baltimore Railroad Co. *v.* Quigley, 21 Howard, 209; Green *v.* London Omnibus Co., 7 C. B. N. S. 290; Life and Fire Ins. Co. *v.* Mechanic Fire Ins. Co., 7 Wendell, 31.

‡ Ranger *v.* The Great Western Railway Co., 5 House of Lords Cases, 86; Thayer *v.* Boston, 19 Pickering, 511; Frankfort Bank *v.* Johnson, 24 Maine, 490; Angel and Ames on Corporations, §§ 382, 388.

§ Swan *v.* The British North Australasian Company, 7 Hurlstone & Norman, 603; Hern *v.* Nichols, 1 Salkeld, 289.

the plainest principles of justice the loss should fall upon the defendant. The ethics and the law of the case alike require this result.[*]

Those who created the trust, appointed the trustee and clothed him with the powers that enabled him to mislead, if there were any misleading, ought to suffer rather than the other party.[†]

In the *Bank of the United States* v. *Davis*,[‡] Nelson, Chief Justice, said: "The plaintiffs appointed the director and held him out to their customers and the public as entitled to confidence. They placed him in a position where he has been enabled to commit this fraud."

The director had fraudulently appropriated the proceeds of a bill discounted for the drawer. It was held the drawer was not liable.

The reasoning of Justice Selden in the *Farmers' and Mechanics' Bank of Kent Co.* v. *The Butchers' and Drovers' Bank*[§] is also strikingly apposite in the case before us. He said: "The bank selects its teller and places him in a position of great responsibility. Persons having no voice in his selection are obliged to deal with the bank through him. If, therefore, while acting in the business of the bank and within the scope of his employment, *so far as is known or can be seen by the party dealing with him*, he is guilty of misrepresentation, ought not the bank to be responsible?"

The same principle was applied in the *New York and New Haven Railroad Co.* v. *Schuyler*.[‖]

It was explicitly laid down by Lord Holt, in *Hern* v. *Nichols*.[¶] He there said: "For seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts trust and confidence in the deceiver should be a loser than a stranger," "and upon this the plaintiff had a verdict."

---

[*] Dezell *v.* Odell, 3 Hill, 216.

[†] Farmers' and Mechanics' Bank of Kent Co. *v.* Butchers' and Drovers' Bank, 16 New York, 133; Welland Canal Co. *v.* Hathaway, 8 Wendell, 480.

[‡] 2 Hill, 465.        [§] *Supra*.

[‖] 38 Barbour Supreme Court, 536; S. C., affirmed, 34 New York, 30.

[¶] 1 Salkeld, 289.

Smith, by his conduct, if not by his declarations, avowed his authority to buy the certificates and gold in question from the Merchants' Bank, and the bank, under the circumstances, had a right to believe him.

We have thus far examined the controversy as if the certified checks were void or had not been given. It remains to consider that branch of the case. Bank checks are not inland bills of exchange, but have many of the properties of such commercial paper; and many of the rules of the law merchant are alike applicable to both. Each is for a specific sum payable in money. In both cases there is a drawer, a drawee, and a payee. Without acceptance, no action can be maintained by the holder upon either against the drawer. The chief points of difference are that a check is always drawn on a bank or banker. No days of grace are allowed. The drawer is not discharged by the laches of the holder in presentment for payment, unless he can show that he has sustained some injury by the default. It is not due until payment is demanded, and the statute of limitations runs only from that time. It is by its face the appropriation of so much money of the drawer in the hands of the drawee to the payment of an admitted liability of the drawer. It is not necessary that the drawer of a bill should have funds in the hands of the drawee. A check in such case would be a fraud.*

All the authorities, both English and American, hold that a check *may be* accepted, though acceptance is not usual.†

By the law merchant of this country the certificate of the bank that a check is good is equivalent to acceptance. It implies that the check is drawn upon sufficient funds in the hands of the drawee, that they have been set apart for its

---

* Grant on Banking, 89, 90; Keene *v.* Beard, 8 C. B. N. S. 373; Serle *v.* Norton, 2 Moody & Robinson, 404, n.; Boehm *v.* Sterling, 7 Term, 430; Alexander *v.* Burchfield, 7 Manning & Granger, 1067.

† Robson *v.* Bennett, 2 Taunton, 395; Grant on Banking, 89; Ch. on Bills, 10 ed. 261; Boyd *v.* Emmerson, 2 Adolphus & Ellis, 184; Kilsby *v.* Williams, 5 Barnewall & Alderson, 816; Story on Promissory Notes, §§ 489, 490.

satisfaction, and that they shall be so applied whenever the check is presented for payment. It is an undertaking that the check is good then and shall continue good, and this agreement is as binding on the bank as its notes of circulation, a certificate of deposit payable to the order of the depositor, or any other obligation it can assume. The object of certifying a check, as regards both parties, is to enable the holder to use it as money. The transferee takes it with the same readiness and sense of security that he would take the notes of the bank. It is available also to him for all the purposes of money. Thus it continues to perform its important functions until in the course of- business it goes back to the bank for redemption and is extinguished by payment.

It cannot be doubted that the certifying bank intended these consequences, and it is liable accordingly. To hold otherwise would render these important securities only a snare and delusion.

A bank incurs no greater risk in certifying a check than in giving a certificate of deposit. In well-regulated banks the practice is at once to charge the check to the account of the drawer, to credit it in "a certified check account," and when the check is paid to debit that account with the amount. Nothing can be simpler or safer than this process.

The practice of certifying checks has grown out of the business needs of the country. They enable the holder to keep or convey the amount specified with safety. They enable persons not well acquainted to deal promptly with each other, and they avoid the delay and risks of receiving, counting, and passing from hand to hand large sums of money.

It is computed by a competent authority that the average daily amount of such checks in use in the city of New York, throughout the year, is not less than one hundred millions of dollars.

We could hardly inflict a severer blow upon the commerce and business of the country than by throwing a doubt upon their validity.

Our conclusions as to their legal effect are supported by authorities of great weight.*

Congress has made them the subject of taxation by name.†

But it is strenuously denied that the cashier had authority to certify the checks in question. To this there are two answers:

1. In considering the question of his authority to buy the gold, the evidence that he had given his checks for loans to his bank, and for the proceeds of discounts, was fully considered. Our reasoning and the authorities cited upon that subject apply here with equal force. We need not go over the same ground again. The questions whether the requisite authority was not inferable, and whether the principle of estoppel *in pais* did not apply, should in this connection also have been left to the jury.

2. As before remarked, the organic law expressly allowed the bank to buy coin and bullion. We have also adverted to the provisions of the by-laws, that the cashier shall be responsible " for the moneys, funds, and all other valuables of the bank;" and that " all contracts, checks, drafts, receipts, &c., shall be signed either by the cashier or president." The power of the bank to certify checks has also been sufficiently examined. The question we are now considering is the authority of the cashier. It is his duty to receive all the funds which come into the bank, and to enter them upon its books. The authority to receive implies and carries with it authority to give certificates of deposit and other proper vouchers. Where the money is in the bank he has the same authority to certify a check to be good, charge the amount to the drawer, appropriate it to the payment of the check, and make the proper entry on the

---

* Bickford v. First National Bank, 42 Illinois, 238; Willets v. Phœnix Bank, 2 Duer, 121; Barnet v. Smith, 10 Foster, New Hamsphire, 256; Meads v. Merchants' Bank, 25 New York, 146; Farmers' and Mechanics' Bank v. Butchers' and Drovers' Bank, 4 Duer, 219; affirmed, 14 New York, 624; Brown v. Leckie et al., 43 Illinois, 497; Girard Bank v. Bank of Penn Township, 39 Pennsylvania State, 92.

† 13 Stat. at Large, 278.

books of the bank. This he is authorized to do *virtute officii.* The power is inherent in the office.*

The cashier is the executive-officer, through whom the whole financial operations of the bank are conducted. He receives and pays out its moneys, collects and pays its debts, and receives and transfers its commercial securities. Tellers and other subordinate officers may be appointed, but they are under his direction, and are, as it were, the arms by which designated portions of his various functions are discharged. A teller may be clothed with the power to certify checks, but this in itself would not affect the right of the cashier to do the same thing. The directors may limit his authority as they deem proper, but this would not affect those to whom the limitation was unknown.†

The foundation upon which this liability rests was considered in an earlier part of this opinion. Those dealing with a bank in good faith have a right to presume integrity on the part of its officers, when acting within the apparent sphere of their duties, and the bank is bound accordingly.

In *Barnes* v. *The Ontario Bank,*‡ the cashier had issued a false certificate of deposit. In the *Farmers' and Mechanics' Bank* v. *The Butchers' and Drovers' Bank,*§ and in *Mead* v. *The Merchants' Bank of Albany,*|| the teller had fraudulently certified a check to be good. In each case the bank was held liable to an innocent holder.

It is objected that the checks were not certified by the

---

* Wild *v.* The Bank of Passamaquoddy, 3 Mason, 506; Burnham *v.* Webster, 19 Maine, 234; Elliot *v.* Abbot, 12 New Hampshire, 556; Bank of Vergennes *v.* Warren, 7 Hill, 91; Lloyd *v.* The West Branch Bank, 15 Pennsylvania State, 172; Badger *v.* The Bank of Cumberland, 26 Maine, 428; Bank of Kentucky *v.* The Schuylkill Bank, 1 Parsons' Select Cases, 182; Fleckner *v.* Bank of the United States, 8 Wheaton, 360.

† Commercial Bank of Lake Erie *v.* Norton et al., 1 Hill, 501; Bank of Vergennes *v.* Warren, 7 Id. 94; Beers *v.* The Phœnix Glass Company, 14 Barbour, 358; Farmers' and Mechanics' Bank *v.* Butchers' and Drovers' Bank, 14 New York, 624; North River Bank *v.* Aymar, 3 Hill, 262, 268; Barnes *v.* Ontario Bank, 19 New York, 156, 166.

‡ 19 New York, 156.

§ 14 New York, 624; S. C., 16 New York, 133.

|| 25 New York, 146.

cashier at his banking-house. The provision of the act of Congress as to the place of business of the banks created under it must be construed reasonably. The business of every bank, away from its office—frequently large and important—is unavoidably done at the proper place by the cashier in person, or by correspondents or other agents. In the case before us, the gold must necessarily have been bought, if at all, at the buying or the selling bank, or at some third locality. The power to pay was vital to the power to buy, and inseparable from it. There is no force in this objection.*

It is also objected that each of the checks, after being certified, required an additional stamp. The act of Congress relating to the subject directs certified checks to be included in the circulation of the bank for the purpose of taxation.† This is a conclusive answer to the objection.

In *Brown* v. *London*,‡ judgment in a suit upon two accepted bills of exchange was arrested after verdict because " entire damages " were given, and the count, upon one of the bills, failed to aver that by the custom of merchants and others trading in England the acceptor was obliged to pay. This was in 1671. Other decisions in this class of cases, not less remarkable, are familiar to those versed in the learning of the elder reports. The *law merchant* was not made. It grew. Time and experience, if slower, are wiser law makers than legislative bodies. Customs have sprung from the necessities and the convenience of business and prevailed in duration and extent until they acquired the force of law. This mass of our jurisprudence has thus grown, and will continue to grow, by successive accretions.

We have disposed of this case as it is before us.

How far it may be changed in its essential character, if at all, by a full development of the evidence on both sides in the further trial, which will doubtless take place, it is not for us to anticipate.

---

* Bank of Augusta v. Earle, 13 Peters, 519; Pendleton v. Bank of Kentucky, 1 T. B. Munroe, 182.

† 13 Stat. at Large, 278, ch. 173, § 110.     ‡ 1 Levinz, 298.

The judgment below is REVERSED, AND A VENIRE DE NOVO AWARDED.

Mr. Justice MILLER was not present at the argument of this case, and did not participate in its decision.

Mr. Justice CLIFFORD (with whom concurred Mr. Justice DAVIS), dissenting.

Persons uniting to form an association for carrying on the business of banking are required, as a condition precedent to their right to do so, to make an organization certificate, specifying, among other things, the name assumed by the association, the place where its operations of discount and deposit are to be conducted, designating the State, Territory, or district, and also the particular county and city, town or village, and shall transmit the same, duly acknowledged, to the comptroller of the currency, to be recorded and carefully preserved in his office; and the provision is that the usual business of the association shall be transacted at an office or banking-house located in the place specified in their organization certificate.*

Such an association, when duly organized, have a succession by the name designated in the organization certificate for the period of twenty years, and they may adopt a common seal, may make contracts, sue and be sued, complain and defend in any court of law or equity as fully as natural persons, and may elect or appoint directors, and may exercise all such incidental powers as may be necessary to carry on the business of banking. They may also, by their board of directors, appoint a president, vice-president, cashier, and other officers, and define their duties, . . . and they may, by their directors, dismiss said officers, or any of them, at pleasure, and appoint others to fill their places. By the terms of the act the directors shall consist of "not less than five," and the express enactment is that the affairs of the association shall be managed by the directors.

Evidence that that requirement is regarded as one of im-

* 13 Stat. at Large, 101.

portance, and that it is intended to be peremptory, is also found in the provision prescribing the qualifications of directors as well as in the one defining their duties.   None but citizens of the United States are eligible under any circumstances, and the further regulation is that three-fourths of the number must have resided in the State, Territory, or district, one year next preceding their election, and that they must be residents of the same during their continuance in office.

Besides these guarantees of fidelity, the additional requirement is that each director shall own in his own right at least ten shares of the capital stock, and when appointed or elected shall make oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of the association, and will not knowingly violate, or willingly permit to be violated, any of the provisions of the act under which the association was formed.*

Organized under that act, as both of these banks were when they assumed the name and character of national associations, they are both subject to its provisions and bound by its regulations.

Three checks were held by the plaintiffs, each dated Boston, February 28th, 1867, and signed Mellen, Ward & Co., with the words, Good—C. H. Smith, cashier, written across the face of the checks.   Separately described they read as follows: (1) State National Bank pay to J. K. Fuller, cashier, or order, two hundred and fifty thousand dollars. (2) State National Bank pay to J. K. Fuller, or order, two hundred and seventy-five thousand dollars.  (3) State National Bank pay to Gold, or bearer, seventy-five thousand dollars.

Smith was the cashier of the defendant bank, and the plaintiffs claimed that the defendants, inasmuch as Mellen, Ward & Co. had failed, were liable to pay the whole amount, as the words written across the face of the respective checks were in the handwriting of their cashier; and the defendants refusing to pay the same as requested, the plaintiffs commenced an action of assumpsit against them in the Circuit Court, the declaration containing eleven counts.

* 13 Stat. at Large, 102.

Eight of the counts are founded upon the checks, of which it will be sufficient to refer to the first, which alleges in substance that the signers of the checks made the same to enable the defendant bank to obtain from the plaintiff bank certain gold certificates. held by the latter, of great value, and that the plaintiff bank received the checks and delivered to the defendant bank the gold certificates, and that the defendants, in consideration thereof, declared that the checks were good, and promised to pay the same on presentment, as more fully set forth in the record.

Two of the counts, to wit, the ninth and tenth, allege a sale and purchase of the gold certificates for the sum of six hundred thousand dollars, and that the defendants have refused to pay as they promised. Superadded to these is a count for money had and received for the same amount, which is in the usual form. Process was issued and served, and the defendants appeared and pleaded the general issue, and upon that issue the parties went to trial.

Pursuant to the usual course the plaintiffs introduced the checks described in the declaration, and examined the officers of their bank in support of the cause of action therein set forth. They also read from the books of the defendant bank, produced for their use by the order of the court passed on their motion, the fifth of the articles of association of that bank, and article seventeen of their by-laws. Besides the officers of their own bank, they also examined the bookkeeper of the defendant bank in respect to the account of their cashier as exhibited in the general ledger of the bank.

Twenty-two of the cashiers of the national banks doing business in that city were also examined by the plaintiffs in respect to the powers of a cashier as exemplified in the usage there of such institutions, no one of whom testified that he, as cashier of a national bank, ever certified as good the check of a third person under any circumstances.

Certain other exhibits were also introduced in the course of the examination or cross-examination of the witnesses, as for example the letter of the president to the comptroller of the currency, and the exchange slip, so called, showing that

the checks in suit were not sent to the clearing-house with the other transactions of that day, and that they remained in the hands of the paying teller until the president took the same the next day to present them to the State Bank.

No testimony was introduced by the defendants; but the court, when the plaintiffs rested, on the prayer of the defendants, instructed the jury that the plaintiffs, on the whole evidence, were not entitled to recover, and the jury, under that instruction, returned a verdict for the defendants. Exceptions were taken by the plaintiffs to that ruling, and they sued out a writ of error and removed the cause into this court.

Power to grant a peremptory non-suit is not vested in a Circuit Court; but the defendant may if he sees fit, at the close of the plaintiff's case, move the court to instruct the jury that the evidence introduced by the plaintiff is not sufficient to warrant the jury in finding a verdict in his favor, and that their verdict should be for the defendant, as was done in this case. Such a motion is not one addressed to the discretion of the court, but it presents a question of law which it is the duty of the court to decide in view of the whole evidence, and the decision of the court in granting or refusing the motion, is as much the subject of exceptions as any other ruling of the court in the course of the trial.

In considering the motion the court proceeds upon the ground that the facts stated by the witnesses examined by the plaintiff are true, but that those facts as proved, with every inference which the law allows to be drawn from them, would not warrant the jury in finding a verdict in his favor. When viewed in that light the plaintiff's case, as shown in the evidence, presents a question of law, and it is well settled by the decisions of this court, that it is the duty of the Circuit Court to give the instruction whenever it appears that the evidence is not legally sufficient to serve as the foundation of a verdict.*

Founded as the ruling was upon the assumption that the cashier of the State Bank had no authority under the cir-

---

* Schuchardt v. Allens, 1 Wallace, 370; Parks v. Ross, 11 Howard, 362; Bliven v. N. E. Screw Company, 23 Howard, 433.

cumstances to certify the checks in suit, it becomes necessary to examine that question. Whether he had such authority or not presents a mixed question of law and fact dependent upon the evidence and the legal principles applicable to the case.

Testimony was introduced by the plaintiffs showing that the president of the plaintiff bank exercised very comprehensive powers, including the loan of money, discounts, and the general superintendence of all the affairs of the bank, he reporting and holding himself responsible to the directors for the performance of his duties.

On Saturday, the twenty-third of February, 1867, the cashier of the plaintiff bank informed the president, as the latter testified, that Mellen, Ward & Co. were going to purchase in New York a large amount of gold, and that they desired to know whether the bank would take it as it arrived, and pay for it at the rate of $125 in currency for every $100 of gold. Inquiries were made upon the subject by the president, and explanations were given to him by the cashier, but the result was that the president told the cashier that he might take the gold and pay for it on the same terms that he had taken gold on several previous occasions from the same parties.

Reference is there made to the conceded fact that those parties had, at several times within two or three months previous, brought gold into that bank and received currency for it on the same terms as those proposed to the cashier, and the president testified that he told the cashier that he might take the gold as it arrived on the same terms, and that he, the cashier, might give the parties the right to come into the bank at any time afterwards " and take the gold from the bank, paying the bank for the gold $125 in currency for every $100 in gold, and such premium or compensation as would be equivalent to interest," taking no obligation or note of any kind, but to rely entirely on the purchase of the gold.

Two hundred thousand dollars of the gold arrived on the twenty-sixth of the same month, and the president states

that he was informed by the cashier on that day that it was in the Second National Bank, in gold certificates. Not being familiar with such certificates he advised the cashier that he had better go to the office of the assistant treasurer and ascertain whether the certificates were correct before taking them,.as previously arranged. On the following day two hundred thousand dollars more in similar certificates arrived, and similar directions were given by the president to the cashier. Due inquiry was made at that office in both cases, and all of the certificates, amounting to four hundred thousand dollars, were received and transferred to the plaintiff bank.

Correspondence ensued between the comptroller of the currency and the president of the bank, and the president, in reply to the letter of the comptroller, stated that on the twenty-sixth of the same month the cashier of the bank made an advance ·to Mellen, Ward & Co. of two hundred and fifty thousand dollars in legal tender notes and currency upon two hundred thousand dollars in gold certificates, that no note or security was taken for the amount of the advance except a check signed by the parties for fifty thousand dollars, to be kept in the teller's cash in order to balance his cash account; that on the following day a similar advance upon gold (certificates) was made by the cashier for the same amount to the same parties and in the same manner in all particulars, no note or obligation being taken for the amount so advanced.

Prior to the first of these transactions the same parties, as the president states in the communication, had deposited in the bank the sum of ninety thousand dollars in gold, and received therefor currency at the rate of $125 for $100 in gold, the bank taking no note or obligation on account of the transaction.

Fuller, the cashier, was also examined, and he testified that the inquiry whether the bank would take the gold on its arrival and pay for it was made of him by Carter, the junior member of that firm, and that he, the witness, stated to him to the effect that he could not answer the question,

that he should have to consult the president in regard to it, that he did consult the president of the bank, and that the president told him that if it would not interfere with their ability to make their regular discounts he might take the gold on the same terms as the bank had taken gold of those parties on previous occasions. Notice was accordingly given to Mellen, Ward & Co. by the cashier, as he states, either on that day or on the Monday following, that the bank would afford them the accommodation.

Gold had been taken by the bank of that firm before, and the cashier testified that "they asked if the bank would take gold and pay for it at such time as either party might wish—either the firm of Mellen, Ward & Co., or the Merchants' Bank—at $125 currency for $100 gold, *they paying the bank for the trouble, &c., a sum equal to the interest on the amount of the currency loaned*, and the witness in response to that question, after having consulted the president, *said we would do it."*

Evidently both parties understood that the deposit of the gold with the bank was only for a brief period, and in confirmation of that theory the cashier also testified that Carter said to him, in their preliminary interview, that they, the firm, wanted the bank " to take the gold and pay for it, and that it would be taken away again in a few days, mentioning perhaps the last day of the month or the first day of the following month." He also admits that when the first instalment was received he took a check from the parties for fifty thousand dollars, but he says it was without the knowledge of the president.

On the twenty-eighth of February, which was the last day of the month, at half-past one o'clock, Carter and the cashier of the defendant bank called at the plaintiff bank and went together to the desk of the cashier, they being outside of the counter. Carter said, " We have come for the gold." Smith, the cashier of the defendant bank, said, " We have come in to get an amount of gold," and that he would pay for it by certifying the two checks which he held in his hand when he saw that the gold was all right.

Responsive to that remark the cashier of the plaintiff bank said, step to the paying teller, and he did so, passing on the outside of the counter to that desk, the cashier of the plaintiff bank passing to the same desk on the inside of the counter, and that the latter said to the paying teller, the cashier of the State Bank has come to take some gold, and the paying teller immediately handed to the cashier of the plaintiff bank the package containing eighty-four gold certificates of five thousand dollars each, saying, there are eighty-four in the package, to which Smith, the cashier of the State Bank, standing outside the counter, replied, that is the amount wanted, that is the amount of these checks. They were passed out to Smith and he certified the two checks and handed them to the cashier of the plaintiff bank. Both were certified in the bank by the cashier of the State Bank subsequent to the delivery to him of the gold certificates and not until he had examined the certificates; and the president, in his letter to the comptroller of the currency, states that the two checks, amounting to $525,000, were certified as good " on the spot" by the cashier of the State National Bank.

Davis, the paying teller of the plaintiff bank, was also examined by the plaintiffs, and he testified that the cashier on that day came down to his desk, on the inside of the counter, the cashier of the defendant bank, *accompanied by Carter*, being on the outside; that he, the paying teller, handed to the cashier of his bank eighty-four gold certificates of five thousand dollars each; that the cashier counted the same and passed them over the counter to the cashier of the State Bank; that the cashier of the latter bank handed back two checks drawn by Mellen, Ward & Co. on the State National Bank, one for $250,000, the other for $275,000, certified "Good—C. H. Smith, cashier." They were handed to the cashier and by him to the paying teller, and by the latter to the receiving teller to be added to his account for that day.

Later on the same day, and after the cashier had left the bank, Ward, of the firm of Mellen, Ward & Co., called at the bank and said to the paying teller, " We shall want

some more gold," and immediately left the bank; and in a few minutes the cashier of the State Bank and Carter of the same firm came in, and the former handed to the paying teller a check for seventy-five thousand dollars, signed by Mellen, Ward & Co., with the words, "Good—C. H. Smith, cashier," written across the face of the check, which is the third check described in the declaration. Carter wrote the check in the bank at the desk for customers, situated outside the counter, and it was certified at the same time by the cashier of the State Bank before it was handed to the paying teller.

The check, as the teller testified, called for $60,000 in gold, and he states that he handed thirty thousand, to wit, $10,000 in gold certificates and four bags of gold of five thousand each, to Smith, passing it over the counter, and that Carter took the gold and carried it away, but whether or not he also took the gold certificates he cannot state. Thirty thousand remained to be paid, and after Carter left, he, the teller, took from the vault of the bank six bags of gold, of five thousand each, and placed the same outside the counter in charge of Smith, he being the only person present. Some third person, however, came in while the gold was there, and the impression of the witness is that it was Mellen, of the firm of Mellen, Ward & Co., and that he assisted in carrying it away from the bank.

Evidently the first question upon the merits is whether the State Bank received the gold or the gold certificates, withdrawn from the Merchants' Bank, when the checks in suit were given; for if they did, or if they authorized their cashier to certify the same, they are clearly liable for the whole amount claimed by the plaintiffs. Evidence to show that they authorized their cashier to certify the checks is entirely wanting, and it is quite obvious from the whole case that neither the State Bank nor any of its officers, except the cashier, had the slightest knowledge of the transaction or of any of its incidents until the president of the plaintiff bank, at a quarter past two in the afternoon of the following

day, presented the checks to the president of the State Bank
for payment.

When presented, the president of the State Bank took
them and read them, and immediately replied that they had
not authorized their cashier to certify checks, to which the
president of the plaintiff bank rejoined in substance and
effect as follows : " He has certified checks, and those checks
were given to the Merchants' Bank for gold, the property
of that bank, delivered to him, and that he," the president
of that bank, " wanted payment for that gold." He did not
pretend that they had conferred any actual authority upon
the cashier to certify the checks, but evidently based his
claim upon the ground of an implied legal liability, and
there is not a scintilla of evidence in the case tending to
show any express authority on the part of the cashier to cer-
tify the checks.

Suppose that is so, still it is suggested that there is some
evidence tending to show that the gold and gold certificates,
when they were withdrawn from the Merchants' Bank, were
transferred to, and actually deposited in, the defendant bank,
and the argument is that the Circuit Court erred in not sub-
mitting that question to the jury.

Before the president of the plaintiff bank visited the pres-
ident of the State Bank he called on the cashier of that
bank, and whatever evidence there is in the case applicable
to the issue, which it is supposed should have been sub-
mitted to the jury, consists of the conversation which took
place between those officers during that interview before
the other officers of the defendant bank knew anything of
the transaction.

Just after one o'clock of that day the president of the
plaintiff bank called on the cashier of the State Bank with
the checks in his hands, and he states the conversation as
follows: " I said to him, I thought you were coming in to
pay the gold for those checks early in the morning. Ques-
tion.—To pay the gold? Answer.—To pay the money. I
didn't say gold; to pay the money on those checks early in
the morning. The cashier replied, Yes, I am going out

now to attend to it and get the money. Get the money? said I; didn't you have the money—the gold? Were not the gold certificates delivered to you? Yes, said he, I had them here, but they are not here now; I am going out to get it, and will come in and attend to it. I spoke rather abruptly and said he should do it immediately. He looked up and said, You hold the State Bank. I came back and laid the checks on the desk of the teller."

Grave doubts were entertained by the circuit judges whether the evidence, if it had been objected to, would have been admissible, as it can hardly be maintained that the cashier, under the circumstances, was the agent of the bank to make any such admission in respect to a past transaction; and still graver doubts were entertained whether the supposed admission was understandingly made, as it was obvious that the cashier was abruptly and unexpectedly arraigned for his unauthorized and illegal acts in terms of complaint and in tones of accusation and command, but the judges were quite satisfied, even if the language as reported was deliberately employed, that the statement was untrue; that the admission, even if it was made, was contrary to the fact; that every dollar of the gold and of the gold certificates went directly from the Merchants' Bank to the office of the assistant treasurer for the benefit of the drawers of the checks, as the circumstances abundantly prove.

Regarded in that light, it is settled law that the remark of the cashier was entitled to no weight, as it was an admission contrary to the fact. Direct proof to that effect was not introduced in this case, as the defendants did not introduce any testimony, but the circumstances shown in evidence were equally persuasive and convincing, leaving no doubt in the mind of the Circuit Court that the whole fund withdrawn from the Merchants' Bank was transferred directly to the office of the assistant treasurer to supply a corresponding deficiency in the deposits in that institution which had been embezzled and loaned to the persons whose firm name was signed to the checks.

Some of the circumstances referred to have already been

mentioned, and there are many others reported in the transcript which tend very strongly in the same direction. Enough is exhibited in the record to show beyond all doubt that Mellen, Ward & Co. were extensively engaged in speculations; that they were largely interested in copper stocks; that in their first interview with the cashier of plaintiff bank they disclosed to him the fact that they only wanted the bank to take the gold for a few days, naming the day when they would desire to withdraw the same, and the arrangement as completed with the cashier, and as sanctioned by the president of the bank, gave them the right to call for that amount of gold whenever they might see fit by paying for the same at the same rate, and an additional sum equal to interest from the time the gold was deposited in the bank to the time it should be withdrawn. Authority was given to the cashier to take the gold as it arrived, on the terms proposed, and he was told at the same time that the parties depositing it would be allowed to call for the same amount on the same terms, paying also for the trouble a sum equal to interest while it remained in the bank.

Weighed in the light of these explanations it must require the exercise of much incredulity not to see in the acts, conduct, and declarations of the parties plenary proof that the gold and gold certificates, for which the checks were given, were withdrawn from the bank in pursuance of that arrangement. First Carter appears, then Ward, then Carter again, and finally Mellen, the three being all the members of the firm.

They had informed the cashier through their junior partner that the gold "would be taken away" on the last day of the month or the first day of the following month, and on the last day of the month Carter called and said "we have come for the gold," and when Ward came at a later hour on the same day, to give notice that their necessities were not fully supplied, he made no inquiry, nor did he submit any proposition, but said, "we shall want some more gold," and immediately left, showing conclusively that the contract had been previously made; and finally Mellen, the

senior partner, called to assist in carrying away the last thirty thousand dollars, which, with the thirty thousand previously taken, was delivered by the teller in the absence both of the cashier and of the president.

Loaned and withdrawn as the gold and gold certificates were but for one day, the president the next forenoon, when he found that the same were not returned, nor the amount of the checks paid, immediately took the matter into his own hands. He at once, or just before one o'clock, having previously "*heard that there was trouble at the sub-treasury*," called upon the cashier of the State Bank, and failing to obtain satisfaction there, he proceded, at a quarter before two on the same afternoon, to the room occupied by the president and directors of that bank, and he states that he found the president of the bank and two or three other persons present. Much of what was said on the occasion has already been narrated and need not be repeated.

Two of the persons present were the president of the State Bank and his predecessor in that office, and the president of the plaintiff bank testified that they were considerably excited; that he informed them that *he had just heard that there was trouble at the sub-treasury*, that he thought *they had better go to that office*, adding that if they did *perhaps they would find their gold there*, offering at the same time to go with them if they desired him to do so, and it appears *that he and those two persons* went to the room of the assistant treasurer, and that he introduced them to that officer, saying that they had come to see *if a large amount of gold had not been placed there* to the credit of the State Bank.

What further was said or done on the occasion does not appear, as the plaintiffs' testimony stopped there in respect to that interview, and none was introduced by the defendants. Sufficient, however, was given to satisfy the court beyond doubt that every dollar of the gold and gold certificates was transferred to that institution for the benefit of the drawers of the checks, and that no part of the same was ever received by the defendant bank.

Courts of justice have sometimes said that it is necessary

in all cases to leave the question to the jury if there is any evidence, even a scintilla, in support of the issue, but it is well settled law that the question for the judge is not whether there is literally no evidence, but whether there is none that ought *reasonably* to satisfy the jury that the fact sought to be proved is established.*

Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant a jury in finding a verdict in favor of that party.†

Formerly it used to be held, say the court in that case, that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but that a course of recent decisions has established a more reasonable rule, to wit, that in every case, before the evidence is left to the jury, there is or may be a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.‡

Apply that rule to the present case and it is clear to a demonstration that the ruling was correct, as there is no evidence reported which would warrant a jury in finding that the gold or gold certificates or any part of the same ever went into the defendant bank.§

Express authority in the cashier, either from the directors or under any act of Congress, to certify the checks of third persons is not pretended, and it appearing that no part of the funds withdrawn from the plaintiff bank was ever received by the defendant bank, or that they had any knowledge of the transaction prior to the interview between the presidents of the respective banks, the plaintiffs are forced

---

* Ryder *v.* Wombwell, Law Rep. 4, Exchequer, 39.

† Law Rep., 2 Privy Council Appeals, 335.

‡ Jewell *v.* Parr, 13 C. B., p. 916; Toomey *v.* L. & B. Railway Company, 3 Id. N. S. p. 150; Wheelton *v.* Hardisty, 8 Ellis & Blackburne, 262, 266.

§ Schuchardt *v.* Allens, 1 Wallace, 369.

to invoke usage as the source of the cashier's authority to certify the checks, or to put their case, as in the opinion of the court, upon the legal proposition that the power of the cashier to perform those acts is inherent in the office; that the certificates of the cashier import on their face that he was authorized to exercise that power in behalf of the bank, and that it makes no difference whether the acts were performed in the banking-house of the institution or elsewhere, provided it appears that he added to his signature the word cashier, at the time he certified the instruments.

Whether a usage exists or not, to confer power to do an act which otherwise would not be authorized, is a question of fact dependent upon the evidence, and he who alleges that such a usage exists must prove it, unless it is general and of such long standing that it has become incorporated into, and may be regarded as, a part of the commercial law, which cannot be pretended in this case, as it clearly appears that no such usage exists in the State where the transaction took place. No such evidence was introduced, and the settled rule of law in the highest judicial tribunal of the State is that the cashier of a bank possesses no such authority, unless it is specially delegated to him by the directors, which is in exact accordance with the rule prescribed in the act of Congress giving to the directors the power to appoint or elect a cashier and to manage the affairs of the institution.*

Such a power, say the court in that case, that is, the power of certifying checks, is in fact a power to pledge the credit of the bank to its customers, and is a power which, by the constitution of a bank, can alone be exercised by its president and directors, unless specially delegated by them, and consequently it cannot be implied as a resulting duty or authority *in any individual officer.* Evidence of usage, therefore, cannot confer any original, inherent, and implied power to certify such instruments. Checks had been certified in that case by the teller, but the rule as laid down is equally appli-

---

* 13 Stat. at Large, 102.; Mussey *v.* Eagle Bank, 9 Metcalf, 313.

cable to cashiers, as the court say that the authority is vested in the president and directors, and that it cannot be implied as a resulting duty *in any individual officer*, which includes the cashier as well as the teller.*

Established as that rule was in that State more than twenty-five years ago, by the unanimous decision of the highest court of the State, it is not strange that no cashier in the State could be found who would testify that there was any such usage as is supposed by the plaintiffs. They called twenty-two cashiers, including the cashier of their own bank, but they did not venture to ask the question at all whether there was any such usage, though one or more of the number volunteered to say that none such existed, which was equally well proved by the silence of all the others. Proof of usage authorizing a cashier to certify checks, even if such proof would confer such an authority, which is denied, is certainly wanting, as there is not a scintilla of evidence to that effect to be found in the record.

Evidence of usage is admissible in mercantile contracts to prove that the words in which the contract is expressed, in the particular trade to which the contract refers, are used in a particular sense, and different from the sense which they ordinarily import, and it is also admissible in certain cases for the purpose of annexing incidents to the contract in matters upon which the contract is silent, but it is never admissible to make a contract or to add a new element to the terms of a contract previously made by the parties. Such evidence may be introduced to explain what is ambiguous and doubtful, but it is never admissible to vary or contradict what is plain. Where the language employed is technical or ambiguous, such evidence is admitted for the purpose of defining what is uncertain, but it is never properly admitted to alter a general principle or rule of law, nor to make the legal rights or liabilities of the parties other or different from what they are by the common law.†

---

* 9 Ib. 313.

† Oelricks et al. *v.* Ford, 23 Howard, 63; Barnard *v.* Kellogg et al., *supra*, 383; Insurance Company *v.* Wright, 1 Id. 457; Simmons *v.* Law, 3

Whether such evidence is admissible or inadmissible to prove such an authority, it is quite clear that there was none in this case of any kind, and certainly none which would have warranted the jury in finding that the cashier of the defendant bank had any authority whatever to bind his bank by his certificates that the checks were good.

Interrogatories, however, were put to the cashiers examined as witnesses touching their powers in respect to other transactions, and they testified that the business at the clearing-house was usually conducted by the cashier of the bank, and that in adjusting balances occurring there the cashiers whose banks belonged to that association were accustomed to draw checks for that purpose, and that they were in the habit of receiving each other's checks in such adjustments as the checks of their respective banks; and they also testified that they bought and sold New York funds, as their banks redeemed very largely in that city, which created a necessity for the daily use of such funds in conducting the usual and regular operations of the banks; but the Circuit Court was of the opinion that the evidence was entirely unimportant in this case, as there was no evidence of any usage showing that the cashiers were authorized to certify the checks of third persons, and the judges were confirmed in that conclusion by the fact that it had long been the settled law of the State that no individual officer of a bank possessed any such authority.

Giving full effect to the usage proved, it only shows that a cashier may borrow money of the other banks, in the settlement of balances through the clearing-house, and that he may sign the checks given for the same, and that he may buy and sell New York funds, that is, he may buy for use in redeeming their bills, and he may sell the same when they have an excess beyond what is necessary for that purpose; but the evidence, in the opinion of that court, had no

Keyes, 219; Beirne *v.* Dord, 1 Selden, 97; Bliven *v.* Screw Company, 23 Howard, 431; Dickinson *v.* Gay et al., 7 Allen, 37; Dodd *v.* Farlow, 11 Id. 428; Spartali *v.* Benecke, 10 C. B. 222; Trueman *v.* Loder, 11 Adolphus & Ellis, 598; The Reeside, 2 Sumner, 567.

tendency to prove that the cashier of a National bank might certify the checks of a third person, as in this case, as the settled law everywhere is, that a power evidenced by usage must be considered as defined and limited by the usage.*

Nothing remains but to examine the question, whether there is any such inherent power in the office of a cashier as is supposed by the plaintiffs, as it is clear that the act of Congress confers no such power, and that there is no proof of any such usage in the case even if it be admitted that evidence of usage would be sufficient to establish that theory. Special reference to the by-laws of the bank is unnecessary, as it is not pretended that they confer any such power upon the cashier, and there is not a particle of evidence that the directors, directly or indirectly, ever gave him any such power.

Before attempting to answer the inquiry, what are the usual and ordinary duties of a cashier, it becomes necessary to look somewhat more closely at the circumstances which attended the transaction at the time the checks were certified. None of the checks were signed by the drawers or certified by the cashier in the banking-house of the defendants. On the contrary, the cashier left his own bank and went to the banking-house of the plaintiffs, and there, in the presence of the cashier of the plaintiffs, who knew full well what the arrangement was between his bank and the signers of the checks, and that by virtue of that arrangement they had a right to withdraw from the bank on that day that amount of gold and gold certificates, and that he as cashier was fully authorized by the president of his bank to deliver it to them, on the terms and conditions specified in the arrangement.

He knew, also, that he himself, as cashier, had no authority to certify checks; that the law of the State did not authorize such an act; that he had never done such an act; that it had never been done by the cashier of a National bank in that city; that the act of certifying these checks had not been

---

* The Floyd Acceptances, 7 Wallace, p. 678.

done *in the usual course of business*, nor in the presence of the directors of the defendant bank, as he testifies that the first two checks, amounting to five hundred and twenty-five thousand dollars, were certified " in the bank after the delivery and examination of the certificates; " and the president of the bank, in his letter to the comptroller of the currency, states that they were " certified as good on the spot by the cashier of the State National Bank."

Known to the cashier of the plaintiff bank as all the antecedent circumstances were, the judges of the Circuit Court did not entertain a doubt that he knew full well that the gold and gold certificates were withdrawn for the benefit of the drawers of the checks, and that the cashier of the defendant bank certified the checks as a mere surety or guarantor. Unmistakably he knew that the funds were withdrawn only for a day, for he testified that he was informed when the arrangement was made that the same would be taken away on the last day of the month or the first day of the following month, and the president, in his interview with the cashier of the defendant bank the next day, just before one o'clock, opened the conversation by saying, " I thought you were coming in to pay the gold or the money on those checks early in the morning." Both the president and cashier of the plaintiff bank knew what that arrangement was, and the cashier also knew all the circumstances which attended the execution of the checks and the delivery of the funds. Actual knowledge of all the circumstances on the part of the cashier of the plaintiffs is fully proved, and if he wanted more information he knew that the means of knowledge were at hand, as the cashier of the State Bank was there in his presence, and that if he was not satisfied with his answers he could ascertain the whole truth from the directors.

Suppose it be conceded, for the sake of the argument, that the checks were negotiable instruments, standing upon the same footing as bills of exchange and promissory notes, still the plaintiffs cannot recover if the cashier had no power to execute the certificates, as all the facts and circumstances

were known to the cashier of their bank.. Indorsees of such negotiable instruments for value in *the usual course* of busi-' ness are not obliged to make inquiries, as was held in *Good-* . *man* v. *Simonds;*[*] but it was also held in that case, and is believed to be settled law everywhere, that an indorsee in such a case must not wilfully shut his eyes to the means of knowledge which he knows are at hand, for the reason that such conduct is equivalent to notice, and is plenary evidence of bad faith.[†]

Precisely the same rule was laid down by Baron Parke in the case of *May* v. *Chapman,*[‡] and the same rule has been applied by this court in the case of *The Lulu,*[§] decided at the last term.

He knew that he himself had no authority to do such an act as cashier; that the law of the State forbade it; that no - cashier of a National bank in that city had ever exercised any such authority, and that the means of ascertaining whether the cashier of the defendant bank had such authority were at hand, and the rule, under such circumstances, is well settled that the party must inquire before assuming to act or take the risk that the necessary authority exists.

Examined in the light of the· undisputed circumstances, the case is as strong for the defendants as it would be if the defect of authority had been apparent on the face of the in- struments, as it in fact was to one having such knowledge. Where the defect or infirmity appears on the face of the instrument, the question whether the party who took it had notice or not is a question of law, and must be determined by the court as matter of construction.[||]

Unable to maintain the suit upon these grounds, the plaintiffs are forced back to the grounds assumed by their president in his first interview with the president of the defendant bank, when he said, in effect, that your cashier has certified those checks and I want payment for the gold,

---

[*] 20 Howard, 367.        [†] Stagg *v.* Elliott, 12 C. B., N. S. 380.
[‡] 16 Meeson & Welsby, 355.    [§] *Supra,* 192.
[||] Goodman *v.* Simonds, 20 Howard, 365; Andrews *v.* Pond et al., 13 Peters, 65; Fowler *v.* Brantly, 14 Id. 318; Brown *v.* Davis, 3 Term, 80.

and to that it comes at last.   Undoubtedly the cashier of the defendant bank certified the checks, but the circumstances show that the cashier of the plaintiff bank must have known that he did so without the knowledge of the directors, and if the cashier of the defendant bank had no authority, and the cashier of the plaintiff bank knew it, it is clear to a demonstration that the defendant bank is not liable.   Circumstances, altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute the most convincing and conclusive proof.*

Repeated decisions of this court have determined the question that the power to certify the checks of third persons in behalf of the corporation is not inherent in the office of the cashier of a bank, and also that the exercise of such a power is not within the scope of his usual and ordinary duties.

Cashiers of a bank are held out to the public as having authority to act according to the general usage, practice, and course of business conducted by the bank, and their acts, within the scope of such usage, practice, and course of business, will in general bind the bank in favor of third persons possessing no other knowledge.†

So where a contract was made by the president and cashier of a bank with the indorser of a promissory note due to the bank, that he should be discharged in a certain event, this court held that it was not a part of their duty to make such a contract, and that they had no power to bind the bank except in the performance of their ordinary duties, which was a much stronger case than the one before the court, as the president of the bank joined with the cashier in making the contract.‡

His ordinary duties are quite extensive, but it is settled law in this court that they do not comprehend the making of a contract which involves the payment of money, without

---

* Castle et al. *v.* Bullard, 23 Howard, 187.

† Minor *v.* Mechanics' Bank, 1 Peters, 70.

‡ United States Bank *v.* Dunn, 6 Peters, 59.

an express authority from the directors, unless it be such as relates to the usual and customary transactions of the bank.*

Authority to certify the checks in this case, except what is supposed to be implied, is not pretended, and if it were the theory could not be supported for a moment, as there is no such evidence reported and none such was introduced.

Recurring to the two principal checks it will be seen that the plaintiff bank or their cashier, which is the same thing, is the payee, and inasmuch as the same were certified in the presence of the cashier of the plaintiffs, who knew all the circumstances, the suggestion that they are innocent holders as against the defendants cannot be supported. If a bank may be held liable in any case upon a certificate of their cashier that a check is good when they have no funds of the drawer, it is not because the cashier is deemed authorized to make such a certificate, but because the bank is bound by his representation, notwithstanding it is false and unauthorized.†

Substantially the same concession is also made in the case of *North River Bank* v. *Aymar*,‡ and in *F. & M. Bank* v. *B. & D. Bank*.§ Like concession is also made in the case of *Railroad Co.* v. *Schuyler*.‖ Evidently the case of the *Mechanics' Bank* v. *Railroad*,¶ makes the same concession, even if it does not fully sustain the English doctrine as exemplified in the leading case of *Grant* ·. *Norway*,** which, in the judgment of the Circuit Court, contains the true rule.††

Much vacillation is exhibited in the decisions of the New York courts upon this subject, but they agree at present that the certificate of the cashier or teller, as the case may be, if regular, in form, and unattended with any special circumstances, amounts to a representation that the drawer of the check has funds in the bank to meet the same, and that the

---

* United States *v.* Bank of Columbus, 21 Howard, 364.

† F. & M. Bank *v.* B. & D. Bank, 16 New York, 131.

‡ 3 Hill, 266.          § 14 New York, 631.          ‖ 34 New York, 72.

¶ 3 Kernan, 615.          ** 10 C. B. 686.

†† Kirk *v.* Bell, 12 English Law & Equity, 389; Coleman *v.* Riches, 29 Id. 329.

certificate unexplained binds the bank whether accurate or erroneous, but that no such consequences will follow if there is anything on the face of the instrument to show the contrary, or if the payee or holder knew that the authority of the cashier to make the certificate depended upon the existence of funds in the bank to meet the liability, and that the bank had none such at the time, and that the payee or party presenting the check knew that fact.*

Carefully examined it will be found that in every one of the cases decided by the courts of that State where the more stringent rule is applied the check was presented at the bank in the *usual course of business*, and that the act of the cashier in making the certificate did in fact amount to an actual representation that the bank held the funds of the drawer to meet the demand.

Some of those decisions are doubtless inconsistent with the decisions of this court and with the English decisions and those of the Supreme Court of Massachusetts upon the same subject; but there is not one of them, if the facts of the case before the court are properly examined and understood, which will sustain the claim of the plaintiffs.

Beyond all question the cashier of the plaintiff bank represented his bank, he was an agent with full authority, and what he knew in respect to the transaction in question must be regarded as known to his bank. Viewed in the light of the circumstances it is clear that he did not receive the certificates as a representation that funds to that amount were in the State National Bank to meet the checks. He knew that the fact was not so, as the drawers were the customers of his own bank, and the case does not show a single instance in which they ever had any dealings with the defendant bank. Instead of that he regarded the acts of the certifying cashier as constituting the defendant bank a surety of the drawers of the checks to his bank, and the conduct of the president the next day in first arraigning the signer of the certificates before he presented the checks to the president

---

* Clarke National Bank *v.* Bank of Albion, 52 Barbour, 596; Irving Bank *v.* Wetherald, 36 New York, 337; Mead *v.* Merchants' Bank, 25 Id. 145.

of the defendant bank strongly confirms that view of the evidence.

Agents, held out as such by their principals for certain defined purposes, well known to the public, cannot bind their principals by any acts done outside of the scope of their authority, as defined by the well-known purposes of their agency. Masters of vessels are authorized to sign bills of lading, and the instruments when duly executed in *the usual course of business* bind the owners of the vessel if the goods were laden on board or were actually delivered into the custody of the master, but it is well settled law that the owners are not liable if the party to whom the bill of lading was given had no goods or the goods described in the bill of lading were never put on board nor delivered into the custody of the master.* Like principles are applied in all cases where the authority of the agent is limited and the limitations as defined by the purposes of the agency are well known to the public.†

Persons dealing with an agent, knowing that he acts only by virtue of a delegated power, must, at their peril, see in each case that the paper on which they rely "comes within the power under which the agent acts."‡

Where the plaintiff in the suit is the payee of the instrument, the correctness of that rule cannot be questioned, and this court decided in that case that the same rule applies to every *subsequent taker* of the paper, adding, what is certainly correct, where the suit, as in this case, is in the name of the payee, "that the protection which commercial usage throws around negotiable paper cannot be used to establish the authority by which it was originally issued."

Cashiers are forbidden by the express decision of this court from making contracts on behalf of their banks not within the scope of their usual and ordinary powers, involv-

---

* The Schooner Freeman, 18 Howard, 187.

† Mussey *v.* Beecher, 3 Cushing, 511; Lowell Bank *v.* Winchester, 8 Allen, 109; Benoit *v.* Conway, 10 Id. 528; Grant *v.* Norway, 10 C. B. 665; Stagg *v.* Elliott, 12 Id. (N. S.), 373; Hubersty *v.* Ward, 8 Exchequer, 330; Alexander *v.* Mackenzie, 6 C. B. 766.

‡ The Floyd Acceptances, 7 Wallace, 676.

ing the payment of·money, without an express delegation of authority from the directors.*

Checks signed at the clearing-house and contracts for the purchase and sale of New York funds are authorized by the directors, and are sanctioned by usage, but cashiers have no such authority to certify checks for third persons, which was well known to the cashier of the plaintiff·bank.

Associations organized under the act of Congress to carry on the business of banking are required by the express words of the act to transact *their usual business* at an office or banking-house, located in the place specified in their organization certificate, and no individual officer ought to be allowed to leave his bank and go·elsewhere to make large contracts without the instruction of the directors. Unless his power in that behalf is limited to the established place of business he may go wherever he pleases for that purpose, and if he certifies checks anywhere within the four seas of our continent, the bank is bound by his contracts. Stockholders and depositors should take warning if such is the law, as the National banks are liable at any moment to be overwhelmed with pecuniary obligations, and involved in utter ruin.

---

* United States *v.* Bank of Columbus, 21 Howard, 364.