## MORRIS v. GRIFFITH & WEDGE CO.

### DOVEY v. SAME.

(Circuit Court, S. D. Ohio, E. D. July 8, 1895.)

Nos. 666, 667.

CORPORATIONS—POWERS OF OFFICERS—SIGNING NOTES.

> W., a stockholder to a small amount and vice president of the W. Company, which was substantially owned and managed by W.'s father, executed certain notes, in the name of the company, for loans, which he represented to be for the company's use. Neither the statutes under which the company was organized nor any regulations or by-laws adopted by the stockholders or directors gave the vice president authority to sign notes, and it did not appear that W. had ever signed any notes for the company, except those in question, and others of which they were renewals, but, on the contrary, that the notes of the company were usually signed by W.'s father, the president, and by the treasurer. The money received for the notes was used, in part, to pay a draft drawn on the company by W. and accepted by his father, in the name of the company, but without the knowledge of the directors, and solely for W.'s benefit, and, in part, deposited in the company's bank account, but credited to W.'s father, to replace a check of the company given to W. and charged to his father. The remainder of the money was retained by W. *Held,* that the W. Company was not liable upon the notes.

These were two actions by Henry G. Morris and John S. Dovey, respectively, against the Griffith & Wedge Company upon two promissory notes. The cases were tried by the court without a jury.

Butterworth & Dowell, for plaintiffs.

J. J. Stoddard and F. A. Durban, contra.

SAGE, District Judge. These actions are upon promissory notes executed in the name of the defendant company, in the city of Philadelphia, Pa., by Frank N. Wedge, who was at the time vice president of the defendant company, and by him there delivered to the plaintiffs. The notes to the plaintiff Henry G. Morris were for $5,300, dated February 6, 1890, at 30 days, and for $5,200, dated March 30, 1890, at 90 days, both to his order. The first was a renewal of a note of the same description dated October 3, 1889, at four months; the second, a renewal of a note dated January 6, 1890; and that was a renewal of a note of the same description dated October 3, 1889. The original notes were for money loaned by Morris, as he understood, and as was represented by Wedge, to the defendant company.

Morris, through his agent, Dovey, gave to Wedge, at Philadelphia, for the two original notes, a New York draft for $10,000, dated October 4, 1889, payable to the order of Dovey & Co., and by them indorsed to the order of Frank N. Wedge. The note to the plaintiff John S. Dovey was made at Philadelphia, January 10, 1890, although dated as at Zanesville, Ohio, for $5,000, and signed in the name of the defendant company by Frank N. Wedge, vice president, and by him there delivered to Dovey, who remitted the money therefor to Wedge in various sums, making up the amount of the note, within 10 days or 2 weeks after the delivery of the note to him, retaining a balance for interest or discount. This also was a loan represented by Wedge, and understood by Dovey, to be for the defendant company. The defense is that Frank N. Wedge had no authority to borrow money for the defendant company, or to use its notes; also that the money sued for was not borrowed for the company; that the company got no part of it, and that it was used by Frank N. Wedge for his individual purposes. That all the money was used by Frank N. Wedge for his individual purposes is in evidence, and uncontroverted, excepting that it appears that $2,500 of the money obtained from Dovey was deposited in bank to the credit of the company. The defendant company was organized under and subject to the provisions of the corporation statutes of the state of Ohio. Section 3248, Rev. St. Ohio, provides that the corporate powers, business, and property of corporations formed under the act must be exercised, conducted, and controlled by the board of directors, or, where there is no capital stock, by the board of trustees. Section 3249 authorizes every corporation to adopt a code of regulations for its government, not inconsistent with the constitution and laws of the state. By section 3251 regulations may be adopted or changed by the assent thereto in writing of two-thirds of the stockholders, or by a majority of the stockholders at a meeting held for that purpose upon due notice. It is to be noted that the power to make regulations is vested in the stockholders, and not in the board of directors. Reference to section 3252 will make it apparent that section 3251 secures to the stockholders an effectual and beneficial control over the board of directors, and salutary means of keeping them and the officers of the corporation in check, so that its affairs shall be managed within due bounds and with due regard to the interests and rights of the stockholders. Section 3252 specifies what may be provided for by regulations, including "the duties and compensation of officers." Section 3250 authorizes the trustees or directors of a corporation to adopt by-laws for their government, not inconsistent with the regulations of the corporation or the constitution and laws of the state, and to change the same at pleasure. Here it is to be observed that the by-laws are for the government of the board of directors. The board of directors of the defendant company undertook, by article 4 of the by-laws of the corporation, to prescribe the duties of the president and of the vice president, as follows:

"It shall be the duty of the president to preside at all meetings of the stockholders and directors, and to sign the records thereof and all certificates of

stock, decide all disputes arising among the stockholders pertaining to the employment of employés, which decision shall be final, and in a general way to perform all the duties usually incident to such office, or which shall be required by the stockholders or directors. It shall be the duty of the vice president to perform all the duties of the president in case of the latter's absence or disability."

Article 5 defines the duties of the secretary, as follows:

"It shall be the duty of the secretary to keep an accurate record of the acts and proceedings of the stockholders and directors, give all notices required by law and the acts of the stockholders and directors; keep proper books of account and books for transfer of stock; on the expiration of his term of office deliver all books, papers, and property of the company in his hands to his successor or the president, and in a general way to perform all the duties usually pertaining to the office."

Article 6, in defining the duties of the treasurer, provides that:

"The treasurer shall receive and safely keep all money and papers of value belonging to the company, and dispose of the same under the direction of the board of directors."

Article 13 provides that:

"The board of directors may appoint an executive committee of not less than three members of their own number, who shall have charge of the management of the business and affairs of the company in the interim between the meetings of the directors, with power to fix prices for the company's products, determine credits, make investments, and generally to discharge the duties of the board of directors, but not to incur debts, excepting for current expenses, unless specially authorized. They shall at all times act under the direction and control of the board of directors, and shall make report to the same of their acts, which shall form a part of the records of the company."

These articles are relied upon as fixing the duty and limiting the authority of the president, the vice president, the secretary, and treasurer, and of the executive committee. As we have seen above, however, the duties of officers must be provided for by regulations adopted by the stockholders, and the by-laws which may be adopted by the directors are to be only for their own government. However, these by-laws, although not authoritative, may be referred to in considering the mode of conducting the business and administering the affairs of the corporation. From the testimony of Mr. Gigax, treasurer and bookkeeper of the defendant company, and called on its behalf, it appears that from the organization of the company down to and including the time of the transactions involved in these actions, Francis Wedge was its president and managing and directing spirit; that he directed its affairs, accepted bills of exchange, and signed notes, and that the treasurer did whatever he was by him directed to do. He testifies that if "we" (meaning the company) needed money he would say to Mr. Wedge or Frank Wedge or Charlie Wedge (brother of Frank N.) that "we needed some money, and I would draw up a note for whatever amount was needed, and we signed it, and we took it to the Citizens' National Bank [of Zanesville] and discounted it, and we checked against that to pay our bills. I would make a list of what we owned, and the Citizens' National Bank would give me New York drafts." He testifies that he wrote the checks and Mr. Wedge signed them. Who was "we" in his testimony respecting the signatures to notes, he was not asked, and did not explain, but if we turn to the record of his testimony as to the signing of a $15,660.98 note, to which reference will hereinafter be made, we find

that Frank N. Wedge, the vice president, and his father, Francis Wedge, the president, were standing in the office of the company at Francis Wedge's desk, and the witness saw Francis Wedge, the president, sign the paper, and then Frank Wedge said to the witness, "Sign this note." Witness looked at it, and answered, "No, we don't owe the Citizens' National Bank $15,000." Frank said, "Yes, we do." The witness insisted that they did not, and refused to sign it, except by order of the directors. Witness spoke to one of the directors, and, upon his suggestion, they went to the counsel of the company, and the matter was talked over. The counsel asked whether Mr. Wedge (the president) had credit on the books. The witness answered in the affirmative. Counsel responded that there was no objection to Mr. Wedge's drawing up to the amount of his credit. That was then, as the books show, $27,000. The witness returned to the office, said he would sign the note, provided it was charged to Francis Wedge's account, and he did sign it and so charge it, but did not know what the note was for. From this it would appear that it was the custom for the treasurer as well as the president to sign notes made in the name of the company. There is no testimony in the case that Frank N. Wedge, the vice president, ever was authorized to sign notes, or did in fact sign notes, in the name of the company, excepting those in suit in this case, and others for which they were renewals, and still others,—all which were on account of his personal transactions, but made in the name of the company. Frank N. Wedge was a speculator. He had taken a venture in a proposed belt railroad at Zanesville, which resulted disastrously. He seems to have been a favorite of his father. At all events, his father was induced to assist him not only by advancing money, but by aiding him in the negotiation and use of the notes sued on, of the originals for which they were renewals, and of prior notes, which made up the note for $15,660.98 above referred to. Charles Wedge, the elder brother, remained at Zanesville, was a stockholder in the company, attended strictly to business, and was not contented in his mind over the transactions of Frank N. Wedge, and the use he made of his influence over his father. Frank N. Wedge was the prodigal son.

For the plaintiffs it is urged that the defendant company was a large manufacturing concern which succeeded Griffith & Wedge, a prosperous and wealthy manufacturing firm. In 1885 Griffith died, and Francis Wedge purchased the interest of his estate in the business, and, to preserve the name and good will of the company, organized the defendant corporation. He subscribed for, and was until his death the owner of, all the capital stock, excepting 10 shares transferred to each of his five children, a few shares to workmen and employés, including one share to Gigax, 30 shares subsequently purchased by Charles Wedge, with possibly 50 other shares,—so that for all practical purposes Francis Wedge was the company, the other stockholders having been made such for the purpose of organization, and to enable Francis Wedge to continue the business without change of name through the agency of the corporation. The credit of the compnay depended upon the credit of Francis Wedge. He was president. Frank N. Wedge was vice president and secre-

tary and an active business officer of the company. He bought and sold for the company, contracted debts, and discharged the duties that pertained to the office he held. Francis Wedge chose his own directors, designated the officials, and was supreme in all the company's affairs, by obvious right and by vested authority. Counsel for plaintiffs disclaims any intent of calling in question the legal rights of a small stockholder, or to claim that the power or authority of an officer is greater where he owns substantially all the stock; nor does he claim that the authority of the defendant corporation is not limited and controlled by the statutes under which it was organized, there being no special charters in the state of Ohio. The point sought to be emphasized is that, whatever the legal theory, Francis Wedge was actually in ownership and authority, for all practical uses and purposes, the Griffith & Wedge Company; and that nobody could, and nobody did, dispute or question that fact until about the spring of 1890, when all objections were suggested and stimulated by Charles Wedge, who was solicitous about his prospective share in his father's estate.

Now, while it is unquestionably true that all the facts and circumstances may be looked at to ascertain what was the recognized course of business and the extent of the authority of Francis Wedge as president of the company, his large holdings of the stock of the company cannot be regarded as in the least conferring upon him any authority whatever to manage or control its business. The small stockholder in a corporation is the one especially under the care and protection of the law. Wedge's authority as president must be found, in the absence of any regulation fixing it, by reference to the usual and recognized course of business of the company. It is not shown that, excepting in the instances in question in this litigation, he ever issued the paper of the corporation over his own signature as president, without at least also the signature of the treasurer. As to Frank N. Wedge, it does not appear that he ever, aside from the transactions involved in this action, as vice president signed the name of the company to a note and issued it as such. The negotiation of the notes sued upon was directly between him and the plaintiffs. They relied upon his statement that he was authorized to execute the notes of the company. They were bound to know the statutory provisions hereinbefore cited, defining the rights and authority of the board of directors. All the transactions of the company in the matter of negotiating its notes had been with the home bank at Zanesville, and, so far as the evidence shows, the notes had been signed and used with the concurrence of the president, vice president, and Gigax, the treasurer. So far, then, as the case rests upon the authority of Frank N. Wedge to make and negotiate notes of the company, it is against the plaintiffs. The case of Bank v. Armstrong, 152 U. S. 346, 14 Sup. Ct. 572, is in point. There, upon a proposition signed by the vice president of the Fidelity National Bank, in his own name, without any official designation, a New York bank made a loan of $200,000, which was placed on its books to the credit of the Fidelity Bank, and afterwards drawn out by drafts of that bank, the understanding of the New York bank

being that the proposition for the loan was from the Fidelity Bank.
The supreme court said that it must be shown that the Ohio bank
was really a party to the transaction, either by having authorized
its vice president to effect the loan on its behalf or by having ratified
his action and accepted and enjoyed the proceeds of the discount.
The court said that there was no evidence whatever that the board
of directors of the Fidelity National Bank gave authority to its
vice president to borrow money on behalf of the bank, much less
to borrow so enormous a sum.   The court said the most that could
be claimed in the case was that the vice president acted as the
principal executive officer of the bank, but that it could not be
pretended that as such he had power, without authority from the
board, to bind the bank by borrowing $200,000 at four months'
time.   Granting that the bank in certain circumstances might
become a temporary borrower of money, the court held that such
transactions would be so much out of the course of ordinary and
legitimate banking as to require those making the loan see to it that
the officer or agent acting for the bank had special authority to
borrow money; and that, whatever power the board of directors
had to borrow that sum, it was obvious that the vice president,
however general his powers, could not exercise such a power unless
specially authorized so to do; and that it was equally obvious that
persons dealing with the bank were presumed to know the extent
of the general powers of its officers.   So, here, the public statute
under which the defendant corporation was organized declares that
the corporate powers, business, and property of the corporation must
be exercised, conducted, and controlled by the board of directors,
and that the duties and compensation of officers are to be provided
for by regulations made by the stockholders.   In the case of Bank v.
Armstrong the court said that there was no evidence that the board
of directors of the bank had any knowledge of the transaction,
and the same is true in the present case.   It was said, however,
that the bank might be held if ratification on its part could be
shown, and that a corporation might become liable upon contracts
assumed to have been made on its behalf by an unauthorized agent
appropriating and retaining, with knowledge of the facts, the bene-
fits of the contracts so made on its behalf.

This brings us the second reliance of the defense, to wit, that
the money received from the plaintiffs was used, in the Morris Case, to
pay outstanding obligations of the company, and in the Dovey Case
was placed in part to the credit of the defendant company upon its
bank account.   The money received from Henry G. Morris was used
by Frank N. Wedge to pay an acceptance of the company drawn
by him in favor of Bolton Bliss and Dallett, of New York, and
accepted by Francis Wedge, president.   But that was an indebted-
ness of Frank N. Wedge upon his personal account.   It never came
to the knowledge of the board of directors of the defendant com-
pany.   Here again we turn to Bank v. Armstrong, where the court
say that:

"A ratification, to be efficacious, must be made by a party who had power
to do the act in the first place,—that is, in the present case, the board of

directors; and that it must be made with knowledge of the material facts. There is not the slightest evidence shown in this record that the board of the Fidelity National Bank, by any act, formal or informal, undertook to ratify Harper's action in the premises, or that they had any knowledge of the transaction."

It appeared also in that case that the money advanced by the New York bank was, at Vice President Harper's request, placed to the credit of the Ohio bank, but it was shown that it was withdrawn partly by Hopkins, the assistant cashier, and partly by Harper himself, by drafts in the name of the bank, but that the moneys thus drawn never came into the possession or use of the bank. The court said:

"The moneys were appropriated by Harper to his own use, or, at all events, it does not appear that the bank ever got a penny of the borrowed money, or any benefit or advantage whatever by reason of the transaction. The mere placing of the money in the name of the Ohio bank involved no ratification by the bank, unless it was so placed with their knowledge and assent, nor did the withdrawal of the money by drafts drawn by Harper or by his direction in the name of the bank constitute a receipt by the bank of such money, unless it was, in point of fact, received and used by the bank or for its benefit."

So, in this case, the money was applied to the discharge of a claim which had been put in the form of a claim against the defendant company without the knowledge or consent of its directors, but was in fact a claim growing out of an individual transaction by Frank N. Wedge; and the fact that he had, through his father, without the knowledge or consent of the directors, procured an acceptance of a draft drawn by him as vice president upon the defendant company did not and could not, under the ruling in the case of Bank v. Armstrong, convert the draft into an obligation of the defendant company. Looking at the transaction in its true light, and stripping it of all coverings and disguises, the money received from Morris went to pay Frank N. Wedge's individual indebtedness. As to the $5,000 received from Dovey, it was all paid to Frank N. Wedge. According to his testimony, he turned over $2,500 to the company, by depositing Mr. Dovey's check to that amount to the company's credit in the National Bank at Zanesville. Two days before that, his father had had a check issued to him (Frank N. Wedge) for $2,100, but charged to himself, and when the $2,500 check was deposited, $2,100 of it was credited to his father's individual account. The remaining $400 was credited to Frank N. Wedge's account, and he immediately drew that $400 out. This is, in all essential particulars, what was done in Bank v. Armstrong. As was suggested by counsel, the company was simply made a clearing house in the matter. This case is clearly distinguishable from Merchants' Bank v. State Bank, 10 Wall. 604, where a cashier had certified checks in accordance with his custom, known to and acquiesced in by the directors of the bank. It also differs from the cases dealing with securities that were on their face actually within the scope of the authority of the officer of the corporation issuing them, but defended against because some condition precedent had not been performed, and from cases where the act was clearly within the apparent authority of the officer or agent, and the defense rested upon some fact aliunde. None of the citations recognizing

the presumption as to the regularity of the act, the power ·or authority of the person assuming to act not being in question, apply in this case. As was said by the supreme court in Supervisors v. Schenck, 5 Wall. 784:

"It is settled law that a negotiable security of a corporation which upon its face appears to have been duly issued by such corporation, and in conformity with the provisions of its charter, is valid in the hands of a bona fide holder thereof, without notice, although such security was in point of fact issued for a purpose and at a place not authorized by the charter of the corporation."

The distinction is that in this case there is no showing that either the president or vice president, of the defendant corporation had authority to make and issue its promissory notes, nor that it had been their custom to do so. It has been held that the president of a corporation has no greater powers, by virtue of his office merely, than any other director of the company, except that he is the presiding officer at the meetings of the board. Railway Co. v. James, 22 Wis. 198. In Titus v. Railroad Co., 37 N. J. Law, 98, the supreme court of New Jersey said that:

"In the absence of anything in the act of incorporation bestowing special power upon the president, he has, from his mere official station, no more control over the corporate property and funds than any other director. The affairs of corporate bodies are within the exclusive control of their directors, from whom authority to dispose of their assets must be derived." See, also, Westerfield v. Radde, 7 Daly, 326; McCullough v. Moss, 5 Denio, 567.

It is undoubtedly true that when the president of a corporation by custom exercises larger powers, with the knowledge and acquiescence of the board of directors, the corporation would be estopped to deny their authority. As was said in 10 Wall. 604, evidence of powers habitually exercised by the officer of a corporation (in that case the cashier of a bank), with its knowledge and acquiescence, defines and establishes, as to the public, those powers, provided they be such as the directors of the corporation may, without violation of its charter, confer on such cashier. The trouble with the case for the plaintiffs is that no such custom is shown. On the contrary, the testimony of Frank N. Wedge himself is that, excepting the notes signed by him for his personal individual benefit in the name of the company, he never affixed the company's name to a note; and as to Francis Wedge, it is not shown that he was accustomed to sign notes in the name of the company without the signature also of the treasurer of the company. It is significant in this connection that the necessity for the signature of the treasurer was recognized by both Francis Wedge and Frank N. Wedge when Gigax, the treasurer, refused to sign the note for $15,660.98; for they did not undertake to use it, nor did they claim the right to use it, until Gigax's signature was affixed. The note was for use in the home bank, where all the paper of the company had been discounted, and where the method of doing business by the officers of the company was perfectly understood. The notes sued upon and the other notes made for the benefit of Frank N. Wedge were used at Philadelphia and New York, where the mode of business of the company was not known. Judgment will be for the defendant in each case, with costs.